## Commonwealth *vs.* Herby Caillot
### (and a companion case[1]).

Plymouth. March 6, 2009. - July 10, 2009.

Present: Marshall, C.J., Ireland, Cowin, Cordy, & Gants, JJ.

*Homicide. Constitutional Law,* Confrontation of witnesses, Assistance of
counsel. *Evidence,* Statement of codefendant, Failure to produce evidence,
Exculpatory. *Practice, Criminal,* Capital case, Confrontation of witnesses,
Argument by prosecutor, Assistance of counsel, Instructions to jury, Request
for jury instructions, Discovery.

At a murder trial, the admission in evidence against each defendant of state-
ments made by his codefendant, through the testimony of various police
officers, did not violate the defendants' right of cross-examination or right
to confront witnesses, where most of the statements were not offered for
the truth of the matter asserted, but to show the particular defendant's state
of mind shortly after the shooting in question; and where, with regard to
those statements that were offered for the truth of the matter asserted, any
error in admission was harmless beyond a reasonable doubt, in that neither
defendant suffered prejudice. [254-257]

During closing argument at a murder trial, the prosecutor permissibly argued
an inference regarding motive for the killing that was reasonably derived
from the evidence [257-258]; moreover, no substantial likelihood of a
miscarriage of justice arose from a statement that had a factual basis in the
evidence, but that later turned out to be erroneous [258-259]; further, there
was no merit to the contention that the prosecutor commented on the
defendant's postarrest silence [259]; finally, the prosecutor did not engage
in improper vouching for two witnesses, but argued inferences drawn from
the evidence and responded to arguments of defense counsel [259-260].

At a murder trial, the defendants were not denied their Federal or State
constitutional rights to a fair trial by the prosecutor's failure to make
timely disclosure of material exculpatory evidence (namely, the pretrial
recovery of two of three guns used in the shooting), where no intentional
pretrial suppression of exculpatory evidence occurred, in that there was no
evidence that the prosecution knew that those guns were in State police
custody, and the material that was potentially exculpatory — that discharged
cartridge casings from the murder scene matched discharged cartridge cas-
ings from the firearms in State police custody — was not in the possession
of the prosecutor or police until after the conclusion of the trial; and where
the prosecutor timely disclosed information to the defense that one of the
guns had been used in a nonfatal shooting after the murder in question,
and that another gun had been used in other incidents shortly before the
murder. [260-263]

---

[1]Commonwealth *vs.* Manuel R. Santos.

No ineffective assistance arose from the failure of one of the criminal defend-
ants' counsel to request a humane practice instruction when statements that
that defendant made to police officers were admitted at trial, or from
counsel's failure to object when no such instruction was given, where vol-
untariness was not a live issue when the statements were admitted [263-264];
likewise, neither counsel was ineffective for failing to hire a reconstruction
or ballistics expert [264-265], and counsel for the second defendant was
not ineffective for failing to investigate another suspect based on specula-
tion [265].

There was no merit to the argument of two criminal defendants that a trial
court judge abused his discretion in declining to allow further postconvic-
tion discovery and evidentiary hearings after affording the defendants
considerable posttrial discovery. [265-266]


INDICTMENTS found and returned in the Superior Court Depart-
ment on April 28, 1997.

The cases were tried before *Mitchell J. Sikora, Jr.*, J., and
motions for postconviction relief were heard by him.

*Donald A. Harwood* for Manuel E. Santos.

*John J. Barter* for Herby Caillot.

*Gail M. McKenna*, Assistant District Attorney, for the
Commonwealth.

*Michael R. Schneider & John M. Thompson*, for Committee
for Public Counsel Services & another, amici curiae, submitted
a brief.

GANTS, J. On October 5, 1998, a jury convicted the defend-
ants, Herby Caillot and Manuel R. Santos, of murder in the first
degree, as joint venturers, by reason of deliberate premeditation.
After initially denying postconviction relief, the trial judge
granted the defendants a new trial, finding that the improper clos-
ing argument by the prosecutor concerning motive and newly
discovered ballistics evidence regarding the handguns used in the
murder, considered together, meant that "justice may not have
been done" within the meaning of Mass. R. Crim. P. 30 (b), as
appearing in 435 Mass. 1501 (2001). The Commonwealth ap-
pealed, and we vacated the order granting the defendants a new
trial, concluding that the prosecutor's closing argument was not
improper and that the newly discovered evidence did not "cast[]
real doubt on the justice of the conviction[s]." *Commonwealth* v.
*Caillot*, 449 Mass. 712, 720-722, 726 (2007) (*Caillot I*), quoting

*Commonwealth* v. *Grace*, 397 Mass. 303, 305 (1986). In *Caillot I,* we considered only the Commonwealth's claims of error, reserving the defendants' claims of error for their direct appeal from their convictions. *Caillot I, supra* at 713 n.2. The defendants now appeal from their convictions and from the denial of certain claims of error presented in their various motions for postconviction relief. We affirm the judgments of conviction, decline to grant the defendants a new trial or other relief in connection with their postconviction motions, and discern no basis to grant relief under G. L. c. 278, § 33E.

For ease of reference in evaluating the defendants' claims on appeal, we restate the factual and procedural background of this case, noting that it essentially mirrors that appearing in *Caillot I, supra* at 713-719. The jury could have found that, at approximately 5:45 P.M. on November 19, 1996, Desmond Campbell was standing with his girl friend on the front steps of the three-family house in which he lived at 46 Winthrop Street in Brockton, on the corner of Winthrop Street and Warren Avenue, when he observed a green automobile similar to a Dodge Stratus drive by and stop outside his house behind a bus.[2] He observed a black male in the passenger seat staring at him. The same automobile passed by a few minutes later. A minute or two later, Desmond[3] saw a black male who was approximately six feet tall and who was wearing a black coat, a dark "hoodie" (hooded sweatshirt), blue jeans, and black boots climb down a wall at the nearby house at 451 Warren Avenue. The man went to a white van that was parked in front of the house. Two other men ran behind the van. Fearing that they were enemies (although he did not recognize anyone in the automobile), because he had gotten into many fights in Brockton, he grabbed his girl friend and went into his younger brother Daryl's bedroom on the second floor. He told Daryl that there were three males across the street. Daryl opened the bedroom window to see who was outside, and immediately heard the sound of multiple gunshots.

___

[2]There was evidence that a Dodge Stratus is very similar in appearance to a Chrysler Cirrus and a Plymouth Breeze. There was also evidence that he described the automobile differently on different occasions, one time referring to the automobile as a "green Dodge Stratus or Chrysler Cirrus," and another time solely as a "green Dodge Stratus-like vehicle."

[3]We use first names where there are multiple witnesses with the same surname.

After the shooting stopped, Daryl looked out the window and saw two of the men, both dark skinned and wearing black clothing (one wearing a hoodie), get into a green automobile parked up the street. One man got into the front passenger seat, and the other got into the back seat behind the driver. The automobile drove off down Winthrop Street. The police later recovered twenty discharged nine millimeter cartridge casings from the lawn of 451 Warren Avenue. No one was injured during the shooting.

Desmond's aunt, Phyllis Murphy, and her boy friend lived in the first-floor apartment at 46 Winthrop Street. Teriell Murphy and Delicia Turner are Phyllis's children. The father of Turner's child was Carlo Clermy, the victim.

Turner quickly telephoned Teriell. As a result of the telephone call, Teriell and the victim drove to 46 Winthrop Street in Turner's automobile, a light blue Honda. When they arrived, the police already were there. They spoke with some of their relatives about what had occurred, and departed in the Honda. They drove around Brockton, angry, upset, and eager to retaliate.

The victim was driving. While heading west on Nilsson Street, he stopped at a stop sign at the intersection of Nilsson Street and Warren Avenue, about one-half mile from 46 Winthrop Street. As Teriell was trying to light a "blunt" (marijuana cigar), a white tow truck hauling a station wagon came around the corner. A light green, four-door Chrysler Cirrus then followed the tow truck around the corner, to the left of the Honda, shining its headlights on the Honda. The Chrysler stopped, and the rear door on the driver's side opened. Teriell ducked down and slouched in his seat, and heard multiple gunshots. The driver's side window of the Honda blew out, followed by the passenger's side window, and glass shattered all around. The victim was shot. The Honda drifted forward and to the left, and crashed into a utility pole.

Teriell grabbed a nine millimeter semiautomatic pistol from the victim's waist area and got out of the automobile. Teriell saw a shadowy figure wearing dark clothing getting into the back seat of the Chrysler behind the driver. The Chrysler drove away, traveling east on Nilsson Street. Teriell chased on foot after the automobile, attempting to shoot at it, but the gun would not fire

because the safety was on. Teriell "cocked the hammer" and a bullet fell to the ground. Teriell repeatedly fired at the Chrysler, shooting until he had no ammunition left. The Chrysler passed the tow truck in front of it, at which time Teriell stopped shooting. He left the gun near a shed behind a variety store and returned to the Honda.[4] Police arrived at the scene at approximately 6:16 P.M. The victim died as a result of gunshot wounds to his neck and back.

Officer Thomas M. Spillane of the Brockton police department promptly arrived at the scene, and asked Teriell, who was shaking and appeared disoriented, what had happened. Teriell said he did not know; "[s]omebody just started shooting at us."

While Officer Spillane was securing the scene, he was directed to go to Good Samaritan Hospital in Brockton, approximately three miles away, arriving there at approximately 6:40 P.M. Outside the entrance to the emergency room, Officer Spillane observed a green, four-door Chrysler Cirrus parked in a spot designated for handicapped drivers. The rear driver's side window and the rear passenger's side window were gone, there was glass inside the automobile, and there was blood on the rear seat and carpet.

Hospital personnel directed Officer Spillane to one of the defendants, Manuel Santos, who was wearing a dark hoodie and standing near the main door of the emergency room. Santos admitted that he had been driving the green Chrysler Cirrus parked outside of the emergency room. He stated that he had been heading south on Main Street when someone tried to carjack him. Santos explained that someone had started shooting at him during the attempted carjacking, and he had brought his friend Caillot to the emergency room. Officer Spillane brought Santos outside to two other police officers, and told them to handcuff him and place him in the police cruiser. One of the officers gave Santos Miranda warnings, which Santos said he understood, and then handcuffed Santos and placed him in custody in the back seat of a police cruiser. While walking to the cruiser, Santos told the officers that he "didn't do anything," but knew who did, that he had been carjacked, and asked to speak with a particular Brockton police detective, who was on his day off. The officer turned

---

[4]When the police later returned to the scene with Teriell to retrieve the gun he had left there, they could not find it.

the radio inside the cruiser off after placing Santos in the back seat. A few moments later, Santos knocked on a cruiser door, and when the officer opened the front driver's door, Santos asked, "What do you think, I murdered someone?" At the time, that officer was not aware that anyone had been killed. She told Santos that the detectives would talk to him.

A few minutes later, Detective Arthur McLaren of the Brockton police department arrived. He turned off his portable radio and joined Santos in the back seat of the cruiser. Santos asked if Caillot "was going to be okay," and the detective said that he had only been shot in the hand. Santos told Detective McLaren that he had been driving down Warren Avenue when someone tried to hijack his vehicle. Detective McLaren asked if Santos knew who had shot at his vehicle, and Santos replied that it was "the same nigger that had shot, who had killed Steven." Santos stated that Steven was Steven Auguste, Caillot's first cousin, who had been killed three months earlier. Santos also repeatedly blurted out, "Six feet under or life," and asked Detective McLaren if he knew whether "the other party had died." Detective McLaren had said nothing about anyone being shot.

Meanwhile, inside the hospital, Officer Spillane spoke with Caillot, a black male, who lay on a gurney in the emergency room with his right hand heavily bandaged, and blood seeping through the bandage. Caillot was wearing a navy blue jacket, black sweatpants, and black sneakers. Officer Spillane asked him what had happened. At first, Caillot stated that he could not recall, but later stated that he had been lying in the back seat of an automobile, put his hand in the air, and got shot. He said he had no idea where it happened. Soon thereafter, State Trooper Steven Paul Godfrey arrived and advised Caillot of his Miranda rights. Caillot explained that only he and Santos were in the automobile; Santos was driving. He said he was lying on the back seat of the automobile with his head behind the driver's seat, heard shooting, put his hand up in the air to pull himself up, and was shot. Caillot also spoke in the emergency room that evening with another trooper, State Police Lieutenant Michael Crisp, who knew Caillot from his previous investigation of the murder of Caillot's cousin. Lieutenant Crisp again advised Caillot of his Miranda rights, and Caillot told him essentially the same version

of events, but added that earlier that evening he and Santos had been at a friend's house on Warren Avenue, and decided to go for a ride.[5]

At trial, it was represented that no weapons involved in the shooting had been recovered. A total of forty-six discharged cartridge casings and one projectile or "live round," all nine millimeter in diameter, were recovered from the crime scenes at the house shooting and the fatal shooting. As noted earlier, twenty of the forty-six discharged cartridge casings were recovered from the lawn of 451 Warren Avenue. Nineteen of the discharged cartridge casings were recovered from the intersection of Nilsson Street and Warren Avenue. The remaining seven discharged cartridge casings and the live round were found on Nilsson Street. The Commonwealth's ballistics expert, State Trooper Michael Robert Arnold, testified that the discharged cartridge casings, based on his microscopic comparisons, had come from three different nine millimeter firearms. He explained that the seven discharged cartridge casings found on Nilsson Street came from "gun no. 1." Based on the location of the discharged cartridge casings, this appeared to be the gun that Teriell had fired at the fleeing green automobile. Twelve discharged cartridge casings recovered from the lawn of 451 Warren Avenue and sixteen discharged cartridge casings recovered from the intersection of Nilsson Street and Warren Avenue came from "gun no. 2." Eight discharged cartridge casings recovered from the lawn of 451 Warren Avenue and three discharged cartridge casings recovered from the intersection of Nilsson Street and Warren Avenue came from "gun no. 3." In short, the two firearms that left cartridge casings on the lawn near the house shooting at 46 Winthrop Street were also used roughly thirty minutes later in the shooting one-half mile away at which the victim had been killed.

Trooper Arnold also testified that the spent bullets recovered (with one exception) were "consistent with nine millimeter caliber ammunition," but that, without a weapon that could be used for comparison purposes, he could not state that any of the spent bullets came from any of the discharged cartridge casings recovered. Trooper Arnold went on to state that the discharged

---

[5]Caillot knew his friend only as "Ro."

cartridge casings from gun no. 1 and gun no. 2 could have been used to fire the projectiles recovered from the victim's body.

The defendants did not testify, but their trial counsel called three witnesses in their defense, including the State trooper who was the case officer for the homicide investigation. The defense pointed out that no one identified the defendants as the shooters, no murder weapons were found, no confessions were made, and the projectiles recovered from the victim could not be linked to any of the discharged cartridge casings that had been recovered. The defense also claimed they were the victims of misidentification, eliciting testimony that the front grill of the Dodge Stratus looked different from the front of the Chrysler Cirrus, that one eyewitness thought the automobile fleeing the homicide scene looked like a dark-colored Ford Mustang because it drove so fast, that Turner (the mother of the victim's child) had been followed in her automobile four days before the shooting by two men in a light gray Honda, and that another eyewitness saw someone running south down Warren Avenue after the gun shots had stopped. The defense challenged the credibility of Teriell, noting that the gun he had used was not found where he said he had hid it, and arguing that the two rear side windows of their Chrysler Cirrus could not have been blown away by bullets he fired while chasing the fleeing Chrysler Cirrus from behind. The defense maintained that the defendants were victims of an attempted carjacking, not perpetrators of a homicide.

The defense also pointed to several inadequacies in the police investigation, including the loss of physical evidence (Santos's clothing) and the mishandling of some of the ballistics evidence (discharged cartridge casings), and asserted that the police failed to investigate other viable leads that would have revealed the true identity of the shooters. Last, through cross-examination of Trooper Arnold, the defendants elicited evidence that the discharged cartridge casings recovered at 451 Warren Avenue and at the intersection of Warren Avenue and Nilsson Street matched discharged cartridge casings recovered at other locations before and after November 19, 1996, the date the victim was shot and killed. More particularly, discharged cartridge casings matching those from gun no. 1 were found at the scene of a shooting that took place on November 25, 1996, just six days after the shoot-

ing in this case. Discharged cartridge casings matching gun no. 2 were found at the scene of a nonfatal shooting that occurred on March 4, 1998. Discharged cartridge casings matching those from gun no. 3 were found at the scene of two drive-by shootings, one that took place on September 30, 1996, and another that took place on October 2, 1996. Referencing some of this evidence, the defense argued that the gun Teriell could not locate shortly after the shooting of the victim was quickly used in another shooting, and that gun no. 2 and gun no. 3 were never connected to the defendants.

After their convictions, the defendants, represented by their trial counsel, filed notices of appeal and various motions for postconviction relief based, in part, on prosecutorial misconduct. Specifically, the defendants asserted that the prosecutor improperly argued motive — that the shooting was revenge for the shooting death of Steven Auguste (Caillot's cousin) — when this argument was not supported by, and misstated, the evidence. In written decisions, the trial judge denied the motions.

The defendants' appeals were entered here on September 21, 2000. Thereafter, in July, 2001, represented by new counsel (appellate counsel), the defendants separately filed motions for postconviction relief, which, by order of the full court, were remanded to the Superior Court for disposition. In addition to asserting numerous claims of ineffective assistance of trial counsel, the defendants again argued that the prosecutor's closing argument was improper because the prosecutor had been "overzealous" in attributing a motive for the victim's death to the defendants. Caillot's appellate counsel stated: "To the extent that this [c]ourt has already considered the issue of prosecutorial misconduct, it is requested that this motion be considered as an amendment to the previously filed motion or a motion for reconsideration thereof." Santos's appellate counsel also asked for reconsideration of the judge's denial of his first motion for postconviction relief.

In November, 2002, the defendants filed a joint motion to amend their previously filed motions for postconviction relief. The motion asserted that newly discovered evidence consisting of the pretrial recovery of gun no. 2 and gun no. 3, and information related to the use of those guns in other shootings by individuals other than the defendants, warranted a new trial. They also

asserted that this evidence constituted material exculpatory evidence that was withheld by the prosecutor in violation of *Brady* v. *Maryland*, 373 U.S. 83 (1963). In a written decision, the judge concluded that, pursuant to Mass. R. Crim. P. 30 (b), a new trial was warranted based on the combined grounds of improper closing argument by the prosecutor and newly discovered evidence. As has been stated, we vacated the order granting a new trial. *Caillot I*, *supra* at 713.

We now address in turn the defendants' claims of error.

1. *Crawford and* Bruton *violations.* Each defendant argues that the admission of statements made by his codefendant through the testimony of various police officers violated the confrontation clause of the Sixth Amendment to the United States Constitution, as interpreted in *Crawford* v. *Washington*, 541 U.S. 36 (2004) (*Crawford*), as well as art. 12 of the Massachusetts Declaration of Rights. Caillot further asserts that admission of the challenged statements violated the principles stated in *Bruton* v. *United States*, 391 U.S. 123 (1968). The Commonwealth contends that the statements were properly admitted because they were not offered for their truth. Thus, the Commonwealth maintains, there was neither a *Crawford* nor a *Bruton* violation.[6]

In a criminal case, the prior statements of a defendant may be offered in evidence by the Commonwealth. Such evidence, however, if offered for the truth of the matter asserted, is admissible only against that defendant and not against any codefendant, as to whom it is inadmissible hearsay. *Bruton* v. *United States*, *supra* at 137. In *Bruton*, the United States Supreme Court recognized

---

[6]The defendants were tried in September, 1998, well before the United States Supreme Court issued (on March 8, 2004) *Crawford* v. *Washington*, 541 U.S. 36 (2004). Although the defendants, in their postconviction motions, sought relief based in part on a *Crawford* violation, the judge denied such relief, concluding that the *Crawford* decision could not be retroactively applied. Because we are now addressing the defendants' direct appeals (as well as the propriety of the rejection of certain claims asserted in their motions for postconviction relief), it is appropriate for us to review whether there was a *Crawford* violation. See *Griffith* v. *Kentucky*, 479 U.S. 314, 322 (1987) ("failure to apply a newly declared constitutional rule to criminal cases pending on direct review violates basic norms of constitutional adjudication"); *Commonwealth* v. *Burgess*, 450 Mass. 422, 431 (2008); *Commonwealth* v. *Galicia*, 447 Mass. 737, 739 (2006). Cf. *Whorton* v. *Bockting*, 127 S. Ct. 1173, 1177-1184 (2007) (*Crawford* decision not retroactive to cases already final on direct review). The Commonwealth does not argue to the contrary.

that, when the confession of one defendant inculpates the other in the commission of the crime, the risk that a jury will disregard a judge's instruction to consider the confession only against the confessing defendant and not the codefendant "is so great, and the consequences of failure so vital to the [codefendant], that the practical and human limitations of the jury system cannot be ignored." *Id.* at 135. Consequently, the Supreme Court held that the admission of such damaging hearsay evidence, even if limited to the confessing defendant by the judge's instructions, violates the codefendant's constitutional right of cross-examination under the Sixth Amendment's confrontation clause. *Id.* at 135-137. See *Commonwealth* v. *Adams*, 416 Mass. 55, 58 (1993).

In *Tennessee* v. *Street*, 471 U.S. 409, 413-414 (1985), the Supreme Court held that the confrontation clause concerns that arise when hearsay evidence is admitted as substantive evidence against a defendant (or when a limiting instruction to consider that substantive evidence only against the confessing defendant may not be effective) do not arise when the evidence is not offered for the truth of the matter asserted and therefore is not hearsay under traditional rules of evidence. See *Anderson* v. *United States*, 417 U.S. 211, 219 (1974) ("Out-of-court statements constitute hearsay only when offered in evidence to prove the truth of the matter asserted"). When the Supreme Court in *Crawford* held that testimonial out-of-court statements are inadmissible under the confrontation clause of the Sixth Amendment "unless [the declarant] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination," *Crawford, supra* at 54, the Court, citing *Tennessee* v. *Street, supra* at 414, added parenthetically that "[t]he [confrontation] [c]lause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford, supra* at 59-60 & n.9. See *Commonwealth* v. *Pelletier*, 71 Mass. App. Ct. 67, 71 (2008); *Commonwealth* v. *Furr*, 58 Mass. App. Ct. 155, 161 (2003).

Here, Santos's statements to police on the evening of the victim's murder were admitted without limitation; the judge did not instruct the jury to consider this evidence only against Santos or advise them that it was not to be considered for the truth of the matter asserted. Caillot's statements to police that evening

were also admitted without limiting instructions. This would be error if these statements reasonably could have been considered by the jury for the truth of the matter asserted and therefore were inadmissible hearsay.

Most of what Santos said to the police — that the black male who shot Caillot's cousin had shot Caillot during an attempted carjacking of the green Chrysler Cirrus Santos was driving on Main Street or Warren Avenue — was not offered for the truth of the matter asserted but to show Santos's state of mind approximately thirty minutes after the deadly shooting. See *Commonwealth* v. *Qualls*, 440 Mass. 576, 585 (2003). Indeed, the Commonwealth offered these statements of Santos precisely to argue that it was a lie, concocted by Santos to explain why Caillot was shot and why the rear windows of the Chrysler Cirrus had been blown into pieces of glass inside the automobile. It was the defense, not the Commonwealth, who argued that Santos's explanation should be found to be true; the success of the Commonwealth's case against both Santos and Caillot depended on the jury conclusively finding it false. See *Anderson* v. *United States*, *supra* at 219-220 (false statements generally do not fall within rationale of hearsay rule).[7]

Similarly, most of what Caillot said to the police that night in the emergency room — that he was lying on the back seat of the car, with Santos driving, heard shooting, put his hand in the air to lift himself up, and was shot in the hand — was not offered for the truth of the matter asserted, but to demonstrate Caillot's state of mind. The Commonwealth offered this evidence to argue that Caillot's version of events was intended to be a lie; it was the defense who argued that it was true.

Certain statements made by Santos and Caillot, however, were considered for the truth of the matter asserted. The jury learned from Santos's statements that Caillot was in the Chrysler Cirrus with him and that Caillot's cousin had been murdered three months earlier, and could have considered that information against Caillot. The jury learned from Caillot's statements that Santos

---

[7]Other statements made by Santos (that Santos did not do anything but knew who did and "[s]ix feet under or life") or questions he asked (whether the police thought he murdered someone or whether the other party died) were also plainly offered to show Santos's state of mind, and could not reasonably have been offered for the truth of the matter asserted.

was driving the Cirrus when Caillot was shot, and that he and Santos earlier had been at Ro's house on Warren Avenue that evening, and could have considered that information against Santos. Even if this evidence had been admitted over timely objection, any error was harmless beyond a reasonable doubt. See *Commonwealth* v. *Burgess*, 450 Mass. 422, 432 (2008). As to any prejudice suffered by Caillot, Caillot himself admitted that he was in the Chrysler Cirrus with Santos, and the jury learned from the testimony of Lieutenant Crisp that Caillot's cousin had recently been murdered. As to any prejudice suffered by Santos, Santos himself admitted that he was driving the Chrysler Cirrus when Caillot was shot, and the jury never learned who Ro was or where Ro lived on Warren Avenue, so no adverse inference could have arisen from this evidence regarding Santos's whereabouts before he drove away with Caillot.

Consequently, any error in the admission of the statements to the police by Santos and Caillot, whether characterized as a *Bruton* or *Crawford* error, was harmless beyond a reasonable doubt.[8]

2. *Prosecutor's closing argument.* The defendants argue that

---

[8]Because we find any error harmless beyond a reasonable doubt, we need not determine whether each defense counsel properly objected to the admission of the codefendant's out-of-court statements against his client or whether each made an informed strategic choice to allow the testimony because it was beneficial to his client. Caillot's trial counsel moved in limine in advance of trial that the judge instruct the jury that Santos's statements be considered only against Santos and not against Caillot. The judge deferred ruling on the motion until the offer of the statements at trial. However, when Santos's statements to the police were admitted in evidence, Caillot's counsel did not immediately renew the motion or ask for a ruling, and none was given. After the prosecutor elicited from Detective McLaren Santos's statement that the black male who shot at him was the same person who killed Caillot's first cousin three months earlier, Caillot's trial counsel, at side bar, informed the judge, "There is still a motion in limine with regard to anything [Santos] says being imputed to [Caillot], but . . . . I haven't got that far yet . . . ." The judge offered to give the jury a cautionary instruction that comments by Santos were not to be imputed or attributed to Caillot, but never did, and Caillot's trial counsel ultimately did not insist on such an instruction. His failure to press for a limiting instruction may have been strategic; Caillot's trial counsel stated at that side bar, "I don't know whether anything [Santos] says should be taken to be true, but it seems consistent with the evidence anyhow."

Santos's trial counsel did not ask for a limiting instruction but did move in limine to bar the admission of any joint venturer statements. The judge also deferred that motion until trial, but never ruled on it. The statements could not

the prosecutor's closing argument (1) improperly commented on motive without a factual basis; (2) inaccurately stated that no guns had been found; (3) improperly commented on Caillot's "post arrest silence"; and (4) improperly vouched for the credibility and character of two of its witnesses. "[P]rosecutors are held to a stricter standard of conduct than are errant defense counsel and their clients." *Commonwealth* v. *Kozec*, 399 Mass. 514, 519 (1987). Remarks made during closing arguments are considered in the context of the whole argument, the evidence admitted at trial, and the judge's instructions to the jury. *Commonwealth* v. *O'Connell*, 432 Mass. 657, 659 (2000), and cases cited.

a. We first take up the defendants' contention concerning motive. Over the objection of the defendants, the prosecutor had argued that the shooting was revenge for the shooting death of Steven Auguste (Caillot's cousin). We reject the defendants' claim that there was an inadequate factual basis to support this argument. As we previously stated in *Caillot I*, *supra* at 720-721, "the prosecutor's argument concerning motive was supported by evidence at trial, namely, Santos's statements to Detective McLaren that the person who had shot at him and Caillot was 'the same nigger that had shot, who had killed' " Caillot's cousin. We explained that, "[b]ased on this testimony, the jury could have found that the defendants believed that one or more of the occupants of the other car who shot at them had been involved in the murder of Caillot's cousin. The prosecutor permissibly argued this inference that was reasonably derived from the evidence." *Id.* at 721, and cases cited.

b. The prosecutor's statement that "[t]here were no guns that were found anywhere in this case" had a factual, but what later turned out be erroneous, basis in the evidence at trial. There is no claim that the prosecutor knew, or reasonably should have known, this statement to be false. Nor do the defendants explain how this

have been admitted as joint venturer statements because the judge never made a finding that these statements were made in furtherance of the joint venture, and never informed the jury that they must make such a finding before they could consider the statements of one joint venturer against the other. See *Commonwealth* v. *Nascimento*, 421 Mass. 677, 681 (1996), and cases cited. Santos's trial counsel did not ask for a limiting instruction when Caillot's statements were admitted in evidence.

remark, to which there was no objection, created a substantial likelihood of a miscarriage of justice.

c. The defendants assert that the prosecutor improperly commented on Caillot's "post arrest silence" when the prosecutor remarked that, when Caillot first spoke with police at the hospital, he told them that he did not remember what had happened; and that such conduct was not consistent with that of an "innocent victim [who should] want to do everything to help the police corral the person [who] shot him." The defendants wrongly characterize Caillot's encounter with the police as occurring "post arrest." Caillot was in a hospital bed and had not been arrested when this initial exchange with police (Officer Spillane) took place. The argument was proper.

d. The defendants argue that the prosecutor improperly vouched for the credibility and character of Teriell and Detective McLaren. There was no objection to the alleged instances of vouching. We therefore review to determine whether the statements were improper and, if so, whether they created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Sanders*, 451 Mass. 290, 296 (2008). A prosecutor engages in improper vouching if he "expresses a personal belief in the credibility of a witness, or indicates that he . . . has knowledge independent of the evidence before the jury." *Commonwealth* v. *Wilson*, 427 Mass. 336, 352 (1998). A prosecutor properly may comment on and draw inferences from the trial evidence, *Commonwealth* v. *Chavis*, 415 Mass. 703, 713 (1993), and cases cited, and may state logical reasons why a witness's testimony should be believed, *Commonwealth* v. *Rolon*, 438 Mass. 808, 816 (2003).

The prosecutor said, "What [Teriell] did was he told the truth based on the evidence in this case, based on what could be corroborated. What he said could be corroborated independently and by other witnesses." While the better course would have been for the prosecutor to have avoided using the phrase "he told the truth" in the context in which the remark was made, the jury would have understood that the prosecutor intended to convey not that he knew what Teriell had stated was truthful, but that Teriell's testimony was credible because there was physical evidence corroborating his testimony. See *Commonwealth* v. *Ray-*

*mond*, 424 Mass. 382, 391 (1997). The remarks were supported by evidence, and reasonable inferences therefrom, such as ballistics evidence recovered from Nilsson Street that was consistent with Teriell's account of events. Further, the remarks permissibly were made in response to defense counsel's argument that Teriell was "lying through his teeth" when he testified at trial. See *Commonwealth v. Smith*, 450 Mass. 395, 408, cert. denied, 129 S. Ct. 202 (2008).

In describing the conversation between Santos and Detective McLaren on the way to the police station, the prosecutor stated that Detective McLaren, "being the good detective that he is, asks [Santos] the next logical question. Who shot into your car?" Later, after stating that Detective McLaren had turned off his police radio when he was with Santos, the prosecutor remarked, "These are good, thoughtful police officers." These statements do not amount to improper vouching. The statements were permissible inferences drawn from the evidence of the police investigation, and also responded to the argument of defense counsel that the police did a poor job in their investigation. *Commonwealth v. Smith, supra.*

3. *Claims in motions for postconviction relief.* a. *Withholding of ballistics evidence.* After trial, as a result of discovery ordered by the judge in connection with the defendants' motions for postconviction relief, the defendants learned that gun no. 2 and gun no. 3 had been recovered by the Brockton police department and were in State police custody prior to the commencement of the trial in this case. Gun no. 2, a nine millimeter Taurus pistol, was recovered on June 3, 1998, more than three months before trial began, by the Brockton police in connection with the arrest on drug offenses of Joseph Watkins during the execution of a search warrant. The Taurus pistol was delivered to the State police on June 25, 1998, and a "certificate of examination and test firing" dated June 29, 1998, indicated that the State police firearms identification unit examined, test fired, and documented information about the Taurus. The discharged cartridge casings fired from gun no. 2 were matched with this Taurus pistol sometime on or after June 16, 2000.

The Brockton police also recovered gun no. 3, a Glock nine millimeter pistol, from Donald Averett on April 10, 1998, and delivered it to the State police for examination and testing on

May 11, 1998, who test fired it the next day. There is no evidence that the discharged cartridge casings fired from gun no. 3 were matched with this Glock pistol until after the trial in the instant case. In short, the State police had what turned out to be gun no. 2 and gun no. 3 in their custody before the trial, but did not know it until after the jury returned their guilty verdicts.

In ruling on the defendants' motions for a new trial, the judge deemed the recovery of the probable murder weapons[9] to be newly discovered evidence, and relied in part on this newly discovered evidence in ordering a new trial.[10] In *Caillot I*, we concluded that the defendants had failed to demonstrate that this newly discovered evidence cast real doubt on the justice of their convictions, the standard for a new trial based on newly discovered evidence stated in *Commonwealth v. Grace*, 397 Mass. 303, 305-306 (1986). *Caillot I, supra* at 726. The defendants argue here on direct appeal that they were denied their Federal and State constitutional rights to a fair trial by the prosecutor's failure to make timely disclosure of material exculpatory evidence, namely the pretrial recovery of gun no. 2 and gun no. 3 (and related firearms identification reports and information), in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

In *Brady v. Maryland, supra* at 87, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." See *Commonwealth v. Ellison*, 376 Mass. 1, 21 (1978), and cases cited. To establish a *Brady* violation, a defendant must show that (1) material information was in the possession of the prosecutor or "those police who are participants in the investigation and presentation of the case," *Commonwealth v. Daye*, 411 Mass. 719, 734 (1992); (2) the

---

[9]The Commonwealth, after learning that it had gun no. 2 and gun no. 3 in its possession, never compared bullets fired from these weapons with the two bullets recovered in the autopsy from the victim's body to ascertain that one or both of these weapons fired the fatal shots.

[10]The judge found that the newly discovered evidence, standing alone, "would fall short" of creating a substantial risk that the jury would have reached a different conclusion had the evidence been admitted at trial, but concluded that, when considered together with what he viewed to be the prosecutor's improper closing argument, "justice may not have been done." See *Commonwealth v. Grace*, 397 Mass. 303, 305 (1986).

information tended to exculpate him; and (3) the prosecutor failed to disclose the evidence.[11] See *Commonwealth* v. *Healy*, 438 Mass. 672, 679 (2003), and cases cited; *Commonwealth* v. *Adrey*, 376 Mass. 747, 753 (1978). The so-called *Brady* obligation is one of disclosure; it imposes no obligation on the prosecution to gather evidence or conduct additional investigation. See *Commonwealth* v. *Lapage*, 435 Mass. 480, 488 (2001) ("While the prosecution remains obligated to disclose all exculpatory evidence in its possession, it is under no duty to gather evidence that may be potentially helpful to the defense"); *Commonwealth* v. *Beal*, 429 Mass. 530, 531-532 (1999) (duty of disclosure does not require prosecution to solicit information from witness).

The judge found that there was no evidence that the prosecution knew that they had gun no. 2 and gun no. 3 in State police custody, and that no intentional pretrial suppression of exculpatory evidence occurred. From our independent review of the evidence, we agree. This is not a case where the police knew they had in their custody a firearm that may have been used in a charged murder, and the prosecutor failed to disclose that fact to defense counsel. Rather, this is a case where the police had in their custody two firearms seized in separate investigations, and did not learn from forensic firearms investigation that discharged cartridge casings from these firearms matched the discharged cartridge casings found at the murder scene until after the trial had concluded.[12] Consequently, the material information that potentially was exculpatory — that discharged cartridge casings

[11]Determining whether the nondisclosed evidence is material depends on whether the evidence had been generally or specifically requested. *Commonwealth* v. *Gallarelli*, 399 Mass. 17, 20 (1987). "Where the accused has made a request for evidence sufficiently specific to place the prosecution on notice as to what the defense desires, the evidence must be disclosed even if it provides only 'a substantial basis for claiming materiality exists.' " *Id.*, quoting *Commonwealth* v. *Wilson*, 381 Mass. 90, 108-109 (1980). "By way of contrast, where there has been no defense request whatsoever or only a general request for 'all *Brady*' or 'all exculpatory' evidence," see *Commonwealth* v. *Wilson*, *supra* at 109, "the test is whether the undisclosed evidence creates a 'reasonable doubt that did not otherwise exist.' " *Commonwealth* v. *Gallarelli*, *supra* at 21, quoting *Commonwealth* v. *Wilson*, *supra* at 110. We assume, without deciding, that the defendants made a specific request for this material prior to trial.

[12]The evidence suggests that the matches eventually were made through the help of the "Drugfire" computer system, which compared digital images of

from the murder scene matched discharged cartridge casings from two firearms in State police possession — was not in the possession of the prosecutor or police until after the conclusion of the trial. The prosecutor did timely disclose information to the defense showing that gun no. 2 had been used in a nonfatal shooting on March 4, 1998 (sixteen months after the Clermy murder), and that gun no. 3 had been used in drive-by shootings on September 30, 1996, and October 2, 1996 (less than two months before the Clermy murder), and this evidence was presented at trial. There was no *Brady* violation here.

b. *Ineffective assistance of trial counsel.* The defendants claim a new trial is warranted because they were deprived of their constitutional right to effective assistance of trial counsel based on (1) Caillot's trial counsel's failure to pursue a request for a humane practice instruction; (2) the failure of both Caillot's and Santos's trial counsel to retain a crime scene reconstructionist or ballistics expert; and (3) Santos's trial counsel's failure to investigate another suspect, Stanley St. Louis. With regard to appellate review, we examine the defendants' constitutional claims on effective assistance of counsel under G. L. c. 278, § 33E, which is more favorable to a defendant than are the Federal or State constitutional standards. *Commonwealth* v. *Frank*, 433 Mass. 185, 187 (2001).

i. *Failure to request a humane practice instruction.* Caillot contends that his trial counsel was ineffective in failing to request an instruction in accordance with our "humane practice," see *Commonwealth* v. *Tavares*, 385 Mass. 140, 149-152, cert. denied, 457 U.S. 1137 (1982), when statements he made to police at the hospital were admitted at trial. He further asserts that trial counsel also should have objected when no such instruction was given.

"Under the Commonwealth's 'humane practice,' if the voluntariness of a defendant's statement is a live issue at trial, the judge must instruct the jury that the Commonwealth has the

newly entered discharged cartridge casings against other digital images of discharged cartridge casings that were earlier entered into the system. When the Drugfire system indicated a "hit," a manual comparison of the matched cartridge casings would then be performed by firearms experts in the State police firearms identification section. State Trooper Michael Robert Arnold testified that there was roughly a two-year backlog in entering digital images of newly recovered cartridge casings into the Drugfire system.

burden of proving beyond a reasonable doubt that the statement was made voluntarily and that the jurors must disregard the statement unless the Commonwealth has met its burden." *Commonwealth* v. *Cryer*, 426 Mass. 562, 571 (1998). "A judge has 'no duty to ask the jury to pass on voluntariness unless it is made a live issue at trial.' " *Commonwealth* v. *Benoit*, 410 Mass. 506, 511 (1991), quoting *Commonwealth* v. *Tavares*, *supra* at 150-151. Here, Caillot's trial counsel was not ineffective because the issue of voluntariness was not a live issue when the statements were admitted. See *Commonwealth* v. *Sneed*, 440 Mass. 216, 222 & n.10 (2003).

The evidence at trial and during voir dire[13] established that Caillot was not in custody when he was questioned sequentially in the emergency room by Officer Spillane, Trooper Godfrey, and Lieutenant Crisp; that he appeared to be calm, alert, and coherent; that he was fully aware of what was occurring; that he was not under the influence of any drugs or alcohol; that he had not yet been medicated by hospital personnel in the emergency room; and that he admitted to no wrongdoing.

ii. *Failure to retain experts.* We reject the defendants' contention that their trial counsel rendered ineffective assistance by failing to hire a reconstruction or ballistics expert to investigate how Santos's rear windows had been shattered, which they contend would have shown that they could not have been shattered by any bullet fired by Teriell while chasing after the fleeing automobile. The judge correctly noted:

> "[At trial,] counsel for both defendants vigorously pursued the very point which present counsel want an omitted expert to have made: that it should have been physically impossible for bullets to blow out the rear passenger windows [of Santos's automobile] or to strike Caillot's hand from the rear angle of fire reported by [Teriell's] testimony. . . . This point was not abstruse. The jury

---

[13]Prior to trial, Caillot's trial counsel filed a motion for a voir dire to determine whether statements made by Caillot at the hospital on November 19, 1996, to Lieutenant Crisp were voluntary, asserting that Caillot was only seventeen years old, had no familiarity with the criminal justice system, was injured, and had received drugs and pain killers. The motion was allowed, and a voir dire of Lieutenant Crisp and a hospital nurse was conducted. After hearing, the judge found that Caillot's statements were made voluntarily.

could not reasonably have failed to grasp it. Trial counsel did not need an expert to belabor it. The jury [were] free to believe variations of the general scenario presented by the testimony, including the alternative that Caillot's hand was outside the [window of the automobile] when a bullet struck it; or that the defendants themselves had blown out the windows in preparation of the attempted car jacking explanation."

The judge correctly concluded that the defendants failed to show that further investigation or the testimony of an expert "might have accomplished something material for the defense." *Commonwealth* v. *Satterfield*, 373 Mass. 109, 115 (1977). There was no error.

iii. *Failure to investigate other suspect.* We reject Santos's argument that a new trial is warranted because his trial counsel was ineffective in failing to investigate another suspect, Stanley St. Louis. At the evidentiary hearing on the defendants' motions for postconviction relief, it was brought out that St. Louis lived in the Warren Avenue neighborhood; that he drove a green, four-door late model sedan; that St. Louis had a history of animosity with Teriell; and that Teriell and the victim originally may have suspected St. Louis as having been involved in the shooting at 46 Winthrop Street, on November 19, 1996. Much of this information was known to defense counsel prior to trial. The judge noted that the information developed amounted only to speculation regarding the possibility that St. Louis had killed the victim, and was insufficient to demonstrate a culpable failure to investigate or a manifestly unreasonable strategic judgment. We agree. See *Commonwealth* v. *Rondeau*, 378 Mass. 408, 413 (1979) (ineffectiveness requires more than reasonably questionable "tactical or strategic judgments"). We add that the defendants failed to show that better work by trial counsel might have accomplished something material for the defense. See *Commonwealth* v. *Satterfield, supra.* Substantially more information linking St. Louis to the victim's shooting would have been needed for the information to have been considered by a jury at trial. See *Commonwealth* v. *Rice*, 441 Mass. 291, 305-306 (2004).

4. *Further postconviction discovery.* Although the defendants were afforded considerable posttrial discovery and submitted

numerous filings, including so-called supplements and amendments to previously filed material, Caillot argues (joined by Santos) that further discovery and evidentiary hearings should have been allowed. We reject the argument; there has been no meaningful demonstration that further discovery would be relevant and material, and accomplish anything beyond delaying finality in this case. See *Commonwealth* v. *Martinez*, 437 Mass. 84, 97-98 (2002) (postconviction discovery matter of judge's discretion depending on whether sufficient showing has been made).

5. *Review under G. L. c. 278, § 33E.* There is no basis for relief under G. L. c. 278, § 33E.

*Judgments affirmed.*