NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case.  A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

20-P-970

COMMONWEALTH

vs.

SEAN DESALVO.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

After a jury trial in the District Court, the defendant was convicted of the following eight counts:  three counts of assault and battery on a family or household member, see G. L. c. 265, § 13M (a), one count of assault by means of a dangerous weapon, see G. L. c. 265, § 15B (b), two counts of assault and battery by means of a dangerous weapon, see G. L. c. 265, § 15A (b), and two counts of threat to commit a crime, see G. L. c. 275, § 2.[1]  He now appeals, arguing that the prosecutor improperly withheld exculpatory evidence and that portions of

---

[1] This was the defendant's second jury trial, the first trial having ended in a mistrial.

the complainant's medical records should have been redacted.[2]  We affirm.

Background.  All counts arise out of the defendant's romantic relationship with the victim.  The victim testified at trial as follows to the details of that relationship.  The defendant and the victim met in 2013 through an online dating website.  They dated for three years.  In September of 2016, the victim decided to end the relationship, finding the defendant to be overbearing.  Nevertheless, the two continued to talk.  Through January of 2017, they spent time together, remained sexually intimate, and attempted to fix the relationship.  The victim again ended the relationship, after learning through Facebook that the defendant was engaged to another woman.  She confronted the defendant and decided to block all communication with him.  They had no communication for two weeks.

On February 3, 2017, the victim's sister received a text from the defendant.  He told the sister that he had broken off his engagement and that he wished to meet the victim for lunch.  That day, the two reconciled at a roast beef store in East Boston.  They drove to the defendant's house afterwards.  Once there, the defendant's mood changed.  He began crying, pulled

---

[2] The defendant's appeals of his convictions and of the denial of his motion for a new trial were consolidated for briefing and decision.

out a pistol, and screamed at the victim, telling her that he was going to shoot her and then shoot himself.  She was able to calm him down after half an hour.

Two days later, on February 5, 2017, the victim was sitting on the defendant's bed when the defendant rushed into the bedroom and punched her in the face, a single time, with a closed fist, giving her a black eye.  Apparently, the defendant had seen a post by one of the victim's friends and thought the victim was cheating on him.  The defendant told her that if she went to the cops or left him, he would kill her children.

On March 22, 2017, the defendant grabbed the victim's head and smashed it against a doorframe five or six times.  He yelled that he hated her and asked if she thought he was a fool.  Two days later, she went to the emergency room because she was having dizzy spells and nausea.

Between March and October of that year, the beatings became more frequent.  The victim never went to the police or left the defendant.  He told her that he would kill her if she did.

On October 13, 2017, the victim and the defendant were in bed.  Without warning, the defendant jumped on top of her and headbutted her.  Her eye swelled significantly, but she did not go to the hospital.

A few days later, the defendant and the victim were listening to music in the living room.  The defendant left the

3

room and returned with a gun.  He ran over to the victim and asked her which leg she wanted blown off.  He moved the gun to her chest.  He moved it to her head and then to her arm.  He began poking her with the gun, hard.  He told her that he was going to kill her.  He pulled the trigger, while pointing the gun at her head, but no bullets came out.  The victim begged for her life for forty-five minutes before the defendant calmed down.

The victim testified that three days later, on October 20, 2017, while she was doing laundry, the defendant ran into the room and started punching her all over her body.  He picked up a baseball bat and threatened to break her arm.  He picked up scissors and told the victim that he wanted to stab her.  He gave her one last punch on the head before leaving the house.  After he left, she called for help and was taken to the hospital.

Discussion.  The defendant's first argument on appeal is that he deserves a new trial because the prosecutor withheld exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 87 (1963).  The defendant filed a motion for a new trial on this ground, which the trial judge denied.  "To obtain a new trial on the basis of nondisclosed exculpatory evidence, a defendant must establish (1) that the evidence [was] in the possession, custody, or control of the prosecutor or a person

4

subject to the prosecutor's control, (2) that the evidence is exculpatory, and (3) prejudice" (quotations and citation omitted). Commonwealth v. Caldwell, 487 Mass. 370, 375 (2021). "Of course, inherent in that analysis is the presupposition that the exculpatory evidence at issue was actually undisclosed and is newly discovered." Commonwealth v. Pope, 489 Mass. 790, 798 (2022), quoting Commonwealth v. Caillot, 454 Mass. 245, 261-262 (2009), cert. denied, 559 U.S. 948 (2010).

Prior to sentencing, the prosecutor disclosed that an impact statement of the victim, a written document describing several of the defendant's assaults on her, had been in the Commonwealth's possession prior to trial and had not been disclosed to the defense. Without question this written statement of the victim should have been provided to the defendant pursuant to Mass. R. Crim. P. 14 (a) (1) (A), as amended, 444 Mass. 1501 (2005). The defendant argues that the statements are exculpatory because they are inconsistent with the victim's trial testimony and could have been used to impeach her credibility. See Commonwealth v. Collins, 470 Mass. 255, 267 (2014) ("The Commonwealth is required to disclose exculpatory evidence to the defendant, including, as is relevant here, evidence that would tend to impeach the credibility of a key prosecution witness").

5

We agree that two isolated portions of the victim's impact statement could have been used for cross-examination. First, in the statement, she stated that the defendant punched her repeatedly in the face on February 5, 2017. In her trial testimony, she stated clearly that there was only a single punch. Second, the impact statement did not mention the assaults on March 22, 2017, and October 13, 2017, which she described during her testimony. Although this omission from the statement certainly doesn't prove that the assaults did not occur, defense counsel could at least have used these inconsistencies to attack the victim's memory and the truthfulness of her story. The defendant is therefore correct that "the Commonwealth possessed but did not disclose exculpatory evidence at the time of the defendant's trial." Pope, 489 Mass. at 801.

However, we conclude that the failure to turn over the victim impact statement was not prejudicial to the defendant. While there is some disagreement between the parties as to whether the defendant "need only demonstrate that a substantial basis exists for claiming prejudice from the nondisclosure," see Commonwealth v. Tucceri, 412 Mass. 401, 412 (1992), which is the standard applied "when the defendant has made a specific request for exculpatory evidence," see Pope, 489 Mass. at 801, the defendant's claim fails even assuming this "more favorable"

6

standard applies. That is because the defendant's attempts to use isolated portions of the impact statement to impeach the victim would certainly have led to the introduction of other portions of the document. See Commonwealth v. Wright, 444 Mass. 576, 583 (2005) ("[t]he introduction of parts of statements on cross-examination generally allows detailed examination of the entire statements on redirect" [citation omitted]). Here, the Commonwealth would have been allowed to explore the context of the statement and highlight the reasons why the facts elicited in a lay witness narrative might differ from those elicited through the expert handling of an experienced prosecutor. Attempts to impeach through the victim impact statement would likely have led to the introduction of a number of statements quite harmful to the defendant's case. The Commonwealth may have elicited that she "feared and continued to fear for [her] life and [her] family's because . . . the defendant . . . threatened [her] family, saying that he would send [her] eldest son home in a body bag in pieces and [her] youngest son would be hanging by his genitals in a tree and skinned alive." Or, the prosecution may have elicited that the victim was told that she was "ugly, fat, a terrible parent and that the only way [she]'d ever be able to leave the defendant['s] . . . house was after he had beaten [her] to the point of being unrecognizable with a fire extinguisher." The list goes on. Any use of the impact

7

statement that might have proved beneficial to the defense would have opened the door to a flood of harmful evidence and would have done more harm than good for the defendant's case. We therefore conclude that the trial judge did not abuse his discretion in denying the defendant's motion for a new trial.

The defendant's second argument is that portions of the victim's medical records that were introduced at trial should have been redacted. Specifically, the defendant argues that the medical records improperly included references to an "assault," see Commonwealth v. DiMonte, 427 Mass. 233, 242 (1998), perpetrated by the victim's "boyfriend," see Commonwealth v. Dwyer, 448 Mass. 122, 138 (2006). Trial counsel did not request these redactions, so we must determine whether there is an error that creates a substantial risk of a miscarriage of justice. See Commonwealth v. Belcher, 446 Mass. 693, 696 (2006).[3]

This claim was not included in the defendant's motion for a new trial, and the defendant has not offered an affidavit from

---

[3] In the alternative, the defendant claims that trial counsel was ineffective for failing to seek these redactions. "[W]hen a defendant alleges that his failure to preserve an issue for appeal stems from ineffective assistance of counsel, as this defendant has, we do not evaluate the ineffectiveness claim separately. If we determine that an error has been committed, we ask whether it gives rise to a substantial risk of a miscarriage of justice -- ineffectiveness is presumed if the attorney's omission created a substantial risk, and disregarded if it did not." Commonwealth v. Randolph, 438 Mass. 290, 296 (2002).

trial counsel.  For aught that appears, trial counsel's failure

to redact the medical records may have been a tactical decision.

See Commonwealth v. Dargon, 457 Mass. 387, 397 (2010) (in

reviewing for substantial risk of miscarriage of justice, court

considers whether counsel's failure to raise claim earlier was

reasonable tactical decision).

Trial counsel did bring a motion to redact the records, and

portions of them were redacted.  But he did not seek to redact

the portions to which the defendant now points.  Trial counsel's

theory was that the victim fabricated the allegations so that

she could keep the defendant as her boyfriend.  Counsel argued

in opening statement that the victim "fabricates these

allegations . . . to get [the defendant] arrested, or to punish

him because [she wants] to be with [him], and if [she] can't

have [him], this is what's going to happen."  That theory may

explain trial counsel's decision to leave portions of the

medical record referencing "assault" and "boyfriend" intact.

The fact that the victim chose to tell medical professionals

that her boyfriend was the cause of the injuries -- rather than

choosing to protect his identity and blame the injuries on a

different cause -- was consistent with trial counsel's theory

that the allegations were an attempt to punish the defendant.

Trial counsel may have concluded that the medical records,

scrubbed of "assault" and "boyfriend," would have been of little help to trial counsel's theory of motive.

The failure to seek redaction of these portions of the medical records may also have been part of a deliberate strategy to elicit inconsistencies between the medical records and the victim's claim of assault. In trial counsel's opening statement, he told the jury that when the victim was "examined, she tells them I've been assaulted. It's a past assault." He told the jury "to take a look at these medical records . . . look at the diagnosis. The medical records will tell you there's no objective signs of trauma." In trial counsel's closing argument, he recited portions from the medical record: "Patient presented to ER stating she got in a fight with the boyfriend two days ago, got punched in the head and had her hair pulled." He pointed out that the victim failed to mention the incident where, the victim alleged, the defendant banged her head on a doorframe. Trial counsel compared the victim's reported statements, that she noted "her boyfriend put a gun to her head and chest," to the hospital's conclusion that she has "old ecchymosis over the right eye," emphasizing that "Mass General Hospital said this is not new bruising; this is old." Trial counsel's attempt to discredit the victim's statements by comparing them with inconsistent medical diagnoses may have been a reasonable tactical decision. Therefore, on this record, we

10

find no substantial risk of a miscarriage of justice. For the same reason, we also reject on this record the defendant's claim that trial counsel's failure to redact the medical record constituted ineffective assistance of counsel. See Commonwealth v. Ogden O., 448 Mass. 798, 806 (2007) ("A strategic or tactical decision by counsel will not be considered ineffective assistance unless that decision was 'manifestly unreasonable' when made").

Judgments affirmed.

Order denying motion for new trial affirmed.

By the Court (Rubin, Massing & D'Angelo, JJ.[4]),

*Joseph F. Stanton*

Clerk

Entered: March 24, 2023.

---

[4] The panelists are listed in order of seniority.