Kane, Robert J., J.
Corey Princiotta (“Princiotta”) faces indictments charging him with armed robbery and first-degree murder. The indictments arise out of a June 20, 2009, fatal shooting of John Martin (“Martin”). Martin died while attempting to stop an armed robbeiy being committed at the Petro-Mart, located at 171 Coggeshall Street, New Bedford, Massachusetts.
Princiotta now challenges the legality of a July 29, 2009, court order, issued pursuant to 18 U.S.C. §2703(d), referred to as the Stored Communications Act. The court order commanded T-Mobile Corporation to provide the Bristol County Grand Jury with:
[A]ll subscriber information, cellular tower location information, call detail information, call logs, and text messages for telephone calls made from cellular number 774-444-4766 on June 20, 2009 from 7:00 p.m. to June 21, 2009 at 11:59 p.m. E.D.T.
In re Grand Jury Investigation, No. 2009-789 (Super.Ct. Mass, filed July 29, 2009) (order pursuant to 18 U.S.C. §2703(d)).
In issuing the order, the court (McGuire, J.) relied upon a detailed affidavit, sworn to by Aaron Strojny acting as the Grand Juiy’s legal advisor. The affidavit delineated police intelligence indicating that Princiotta and Mark Goulart (“Goulart”) had robbed the clerk working at the Petro-Mart, and had participated together in the fatal shooting of Martin. It revealed the existence of telephone records, and of calls between phones identified as used by Goulart and Princiotta, both before, and after, the fatal shooting of Martin at Petro-Mart.
MOTION TO SUPPRESS
Princiotta now moves to suppress the cellular tower information obtained pursuant to the July 29, 2009, court order. The suppression motion rest on two grounds: first, that the police possessed Princiotta’s cell phone based on an illegal seizure and second, that the United States, and Massachusetts Constitutions required utilization of a search warrant, rather than a court order to obtain the requested cell phone information.
The second ground for suppression presents the question of whether access to cell-site information constitutes a search for purposes of the Fourth Amendment. Specifically, does access by the government to surveillance information generated by a cell phone constitute a violation of a party’s reasonable expectation of privacy.
Analysis of the motion commences with setting out the facts relating to how the police first learned of phone number 774-444-4766 and then acquired the cell phone bearing that number. The succeeding section of facts describes how cell phones operate, particularly how cell phones and cellular towers integrate, and how a cell phone carrier, collects and uses information from cell phone signals to identify, both historically and prospectively, the location of a cell phone. *69 Further facts describe the cell phone bearing the number 774-444-4766 by identifying its registered owner, its type, and describing its cell phone carrier’s procedures in collecting, storing, and using cell phone location data. Finally, the facts set forth T-Mobile’s privacy policies.
FINDINGS
Based on evidentiaiy hearings held on December 21, 2012, January 8, 2013, and February 12, 2013, the following facts describe how police learned of a cell phone used by Princiotta and how they acquired the phone.
KNOWLEDGE AND POSSESSION OF CELL PHONE
By July 20, 2009, the State Police and New Bedford Police, through inquiry to Princiotta’s probation officer Lynn Miller, knew Princiotta used a cell phone bearing the number 774-444-4766. That same day, Massachusetts State Police Sergeant Michael King (“King”), wanting to speak to Princiotta, called 774-444-4766; Princiotta answered the call. King told Princiotta that the police wished to speak with him; Princiotta agreed to be interviewed, and agreed to meet the police outside a Halifax pond where he was fishing.
The police, including State Police Lieutenant Stephen O’Reilly (“O’Reilly”), met Princiotta, his girlfriend Tony Yunis (“Yunis”), and her child. O’Reilly learned that Yunis had Princiotta’s cell phone. Asked by O’Reilly for the phone, Yunis gave it to him. O’Reilly took the phone and powered it down. Yunis never executed a consent form for her release of the phone to O’Reilly.
CELL PHONES’ RELATIONSHIP TO CELLULAR TOWERS
Based on evidence produced at the evidentiary hearings and from judicial notice of legal authorities, the use of a cell phone and cell phone towers to locate, with varying degrees of precision, the cell phone’s locations are determined as follows.
Once turned on, “[c] ell phones constantly relay their locations to cellular towers, in order that the next inbound call should be received without a hitch.” Kevin McLaughlin, The Fourth Amendment and Cell Phone Location Tracking: Where Are We, 29 Hastings Comm. & Ent.L.J. 421, 426 (2006-2007). ‘This process, called ‘registration,’ occurs roughly every seven seconds.”[1] Id.
When a cell phone user makes a call, the cell phone provider’s switching system, on the basis of the registration data, locates the cell phone that the call has been placed to, along with the nearest cellular tower to that cell phone. In Re Application of the United States, 747 F.Sup.2d 827, 831 (S.D.Tex. 2010). That cellular tower transmits to that cell phone the communications from the caller. Id.
To ensure the best reception, the cellular tower transmitting the communications changes when the cell phone receiver moves from the area of the original connecting cellular tower to an area covered by another cellular tower. Id. That closer cellular tower now handles the call thereby maintaining the best possible reception. Id. This process of shifting the call from one cellular tower to another occurs through the cell phone carrier’s engineering and infrastructure without any need on the part of either the caller or receiver of the call to do anything. Id.
The number and location of the carrier’s cellular towers vary depending on the volume of cell phone use. Id. at 832. Densely populated urban areas, with higher volumes of cell phone use, have correspondingly more cellular towers, making the cellular towers closer together. Id. The distances of the operational cellular tower to a cell phone being used in a densely populated area has, on average, a smaller separation than the cellular towers and cell phone users who are operating in a sparsely populated rural area. Id.
As cell phone use in an area increases, all cell phone carriers naturally install more cellular towers to provide the best possible reception. Id. This cellular tower installation process means that the more cellular towers in a sector, the less distance between a cellular tower and a cell phone being used. Id. at 833.
Cell phone carriers now possess the technological capacity to locate, within a certain radius, where the cell phone is being operated. “By correlating the precise time and angle at which a phone’s signal arrives at multiple sector base stations, a provider can pinpoint the phone’s latitude and longitude to an accuracy within fifty meters or less.” Id. Specialized companies “provide off-the-shelf’ location based products, and system upgrades. Id. Location product development has arisen from providers response to directives from Congress and the Federal Communication Commission, to develop location technology that enhances the nation’s emergency response system (911 calls). Id.
Cell phone carriers store cellular tower location data for varying periods of time. Such stored information ordinarily identifies the transmitting cellular tower at two points: the commencement of the call, and the termination of the call. Id. at 833-34. This stored information assists a cell phone carrier in identifying geographical use patterns. Id. at 834-35. This information may also be used by the cell phone carrier for purposes of maintaining existing towers, installing additional cellular towers, and marketing their product in certain identified areas. Id. at 834.
Where a cell phone carrier is asked by a law enforcement agency to track, prospectively, the location of a cell phone, the carrier, using the enhanced technology, can identify the cell phone’s location as close as two meters.
774-444-4766
On April 23, 2009, a Maureen A. Morgan (“Morgan”), of 374 West Street, Brockton, Massachusetts, *70 opened a T-Mobile account for cell phone number 774-444-4766. T-Mobile’s call information records for June 20, 2009, show incoming and outgoing calls in relation to cell phone number 774-444-8448. According to the records, the originating cellular tower site was 31271 New Bedford, Massachusetts. According to cellular tower location documents, that cellular tower number comes back to 111 Myrtle Street in New Bedford.
T-Mobile, on a regular basis, maintains cellular tower location information for 180 days. The cellular tower information consists of cellular tower signals for the commencement of a call and the signal at the termination of the call. According to T-Mobile, its system would be unable to store all cellular tower/cell phone signals.
Nonetheless, T-Mobile, for the 911 system, maintains all cellular tower location information. This allows T-Mobile, working with law enforcement, to locate the caller of a 911 call to a high degree of precision. T-Mobile also has the capacity to create real time location information. It uses a system known as “pinging” to locate signals every fifteen minutes, with a radius of up to several hundred meters, down to a couple of meters, depending upon variables.
T-Mobile publishes information on cell phone user privacy. On February 16, 2009, T-Mobile published a set of policies. Included in the policies was a policy regarding “location based services.” It recited the following:
Our network detects your device’s approximate location whenever it is turned on (subject to coverage limitations). This location technology makes the routing of wireless communications possible, and is also the basis for providing enhanced emergency 9-1-1 service which permits us to provide your general location to a public safety answering point, emergency medical service provider, or emergency dispatch provider. We may also use this technology to disclose, without a user’s consent, the approximate location of a wireless device to a governmental entity, or law enforcement authority when we are served with lawful process or reasonably believe there is an emergency involving risk of death, or serious physical harm.
T-Mobile Privacy Policy, Ex. 3 at 7.
The record developed in this case fails to indicate that T-Mobile distributed this policy to Ms. Morgan.
DISCUSSION
Princiotta objects to the acquisition, by the police, of the cell phone listed to 774-444-4766. When the police acquired the phone it was possessed by Yunis and owned by Morgan. While Tunis may well have lacked authority to relinquish the cell phone to the police,[2] the cell phone’s possession lacks any bearing on resolution of the Motion to Suppress cell site information. Acquisition of Princiotta’s cell phone number independently derived from Probation Officer Miller’s identification of the phone number.
ACQUISITION OF CELLULAR TOWER INFORMATION
The defendant maintains that the court order, issued under 18 U.S.C. §2703(d) for production of cell phone (cell site) information, constitutes a search implicating constitutional protections. The incidence of a search implicating constitutionally protected privacy rights hinges on whether the search involved a violation of a defendant’s reasonable expectation of privacy. Oliver v. United States, 466 U.S. 170, 177 (1984), quoting in part United States v. Katz, 389 U.S. 347, 360 (1967) (Harlan, J., concurring) (“[T]he touchstone of [Fourth] amendment analysis has been the question whether a person has a ‘constitutionally protected reasonable expectation of privacy’ ”).
A violation of a reasonable expectation of privacy has been defined as occurring “when the government violates a subjective expectation of privacy that society recognizes as reasonable.” Kyllo v. United States, 533 U.S. 27, 33 (2001), quoting United States v. Katz, 389 U.S. 347, 361 (1967) (Harlan, J., concurring). This oft-quoted formulation of a reasonable expectation of privacy, derives not from the majority opinion in Katz v. United States, but rather from Justice Harlan’s concurring opinion. Katz, 389 U.S. at 361. Justice Harlan’s formulation of the reasonable expectation test has been brought into question. It has been criticized as giving the government the means to eviscerate a subjective expectation of privacy. “If it could, the government could diminish each person’s subjective expectation of privacy merely by announcing half-hourly on television that 1984 was being advanced by a decade and that we were all forthwith being placed under a comprehensive electronic surveillance.” Anthony G. Amsterdam, Perspectives on the Fourth Amendment, 58 Minn.L.Rev. 349, 384 (1973-1974). Nonetheless, Judge Harlan’s formulation of what constitutes a reasonable expectation of privacy has been followed by the United States Supreme Court. See California v. Ciraolo, 476 U.S. 207, 211 (1986).
EXPECTATION OF PRIVACT IN PUBLIC AREAS
Analysis of whether a right to privacy applies has often focused upon the location where the activity occurs. Katz, 389 U.S. at 361. Where conduct occurs in public space it fails by virtue of its apparent visibility to others to justify a belief that it constitutes a matter of privacy. Id When an individual stands, walks or transacts activities in public places, he knowingly and voluntarily exposes his presence, actions and associates to being viewed and recorded by others, including governmental officials and agents. Id. at 351. Voluntary exposure of both mundane and intimate behaviors in public places negate any reasoned claim of a justifiable expectation of privacy. Id.
United States Supreme Court cases that followed Katz have generally endorsed the view that the govern *71 ment may watch and record, the presence and actions, of individuals that occur in public space. The police may view such public activities through employment of instrumentalities that enhance the viewer’s natural field of vision, and reveal details of the individual, or his transactions, that are the objects of the observer’s interest. Commonwealth v. Doulette, 414 Mass. 653, 655-56 (1993); see also United States v. Loundmannz, 472 F.2d 1376, 1379 (D.C.Cir. 1972 ); State v. Wong, 708 P.2d 825 (Haw. 1985); United States v. Grimes, 426 F.2d 706, 708 (5th Cir. 1970). The extent of an individual’s relinquishment of his personal security from being observed even reaches what one does, and with whom one does it, as he sits, stands, or acts within his own land that may be viewed by those lodged in planes or helicopters, or other mobile machines, traveling within licensed air corridors. Florida v. Riley, 488 U.S. 445, 449-50 (1989)
But, government surveillance rights bear limits. Oliver v. United States, 466 U.S. 170, 178 (1984) (recognizing that an individual has justifiable security “in the area immediately surrounding his home”). The United States Supreme Court has safeguarded, under the Fourth Amendment, what goes on in the home from intrusions engineered through sophisticated surveillance instruments. Kyllo v. United States, 533 U.S. 27, 34 (2001). In Kyllo, the Supreme Court held that a reasonable expectation of privacy applied to the government’s employment, in public space, of a thermal imaging device to record radiation inside of a residence for the purpose of determining whether the amount of emanated heat going through the house’s roof or sidewalls, indicated the ongoing presence of a marijuana manufacturing process. Id. at 40. The Kyllo court wrote:
there is a ready criterion, with roots deep in the common law, of the minimal expectation of privacy that exists, and that is acknowledged to be reasonable. To withdraw protection of this minimum expectation would be to permit police technology to erode the privacy guaranteed by the Fourth Amendment.
Id. at 34.
THIRD-PARTY RECORDS
An individual’s voluntary publication of his actions to commercial third parties have also been generally considered to contradict the claim of the individual’s justifiable reliance upon the security of that transactional information.[3] A parly’s use of a commercial instrument, or service, such as phone that generates information transmitted to a third-party provider, deprives the user of the right to claim that he possesses rights of privacy in the records stored by the third party. See Smithv. Maryland, 442 U.S. 735, 742 (1979) (finding that people do not have a subjective expectation of privacy in numbers that they dial because “[they] realize that they must ‘convey’ phone numbers to the telephone company, since it is through telephone company switching equipment that their calls are completed”). Nor would the outcome change if the party possessed a subjective expectation of privacy because “it would not be one that society is prepared to recognize as reasonable because ‘a person has no legitimate expectation of privacy in information he voluntarily .turns over to third parties.’ ” United States v. Forrester, 512 F.3d 500, 509 (9th Cir. 2008), quoting in part Smith, 442 U.S. at 743-44. “Analogously, email and Internet users have no expectation of privacy in the to/from addresses of their messages or the IP addresses of the websites they visit because they should know that this information is provided to and used by the Internet service provider for the specific purpose of directing the routing of information.” Forrester, 512 F.3d at 510. Cases on the user’s voluntary identification of the e-mail address or internet search site have drawn the distinction between the destination of the call, or search site from the content of the call, or inquiry. Id., citing Smith, 442 U.S. at 744.
SUBJECTIVE EXPECTATION OF PRIVACY
Does a cell phone user’s activation of the phone, initiation of a call, or acceptance of a call, constitute a voluntary conveyance of the cell phone’s location to others? Can the caller justifiably claim that it retains privacy rights in information generated when it activated the cell phone? In Smith, and other cases involving a voluntary conveyance of information to third parties, the defendant elected to make public what phone he was making the call to by dialing phone numbers that he knew would be viewed by third parties. The caller, in those cases, would thus readily know that he was sharing with others the identity of the phones that he was dialing. Smith, 442 U.S. at 742 (“All telephone users realize that they must ‘convey’ phone numbers to the telephone company, since it is through telephone company switching equipment that their calls are completed”). By dialing the numbers to activate the switching equipment, the caller sees that he is voluntarily sharing that dialed number with the phone carrier. “[I]t is too much to believe that telephone subscribers, under these circumstances, harbor any general expectation that the numbers they dial will remain secret.” Id. at 743.
Can it be equally stated that the average cell phone user knows that his action of turning on his phone radiates signals to a cellular tower that registers that signal with the registration information, convertible to data that can be, to varying degrees, used to determine his location? And, can it be said that the average cell phone user knows to what degree he shares his location with others when he makes or receives a call while moving from one location to another? I think not.
Indeed, I find persuasive the observations made In re Application of the United States, 620 F.3d 304 (2010), in which the court stated:
*72 A cell phone customer has not “voluntarily” shared his location information with a cellular provider in any meaningful way . . . [i]t is unlikely that cell phone customers are aware that their cell phone providers collect and store historical location information. Therefore “[w]hen a cell phone user makes a call, the only information that is voluntarily and knowingly conveyed to the phone company is the number that is dialed, and there is no indication to the user that making that call will also locate the caller; when a cell phone user receives a call, he hasn’t voluntarily exposed anything at all.”
Id. at 317.
Nor did Princiotta, by carrying his cell phone in public space, voluntarily expose to the public where he was over a prolonged period of time. “[U]nlike one’s movements during a single journey, the whole of one’s movements over the course of a [prolonged period] is not exposed constructively because the likelihood anyone will observe those movements is effectively nill.” United States v. Maynard 615 F.3d. 544, 558 (D.C.Cir. 2010).
REASONABLE EXPECTATION OF PRIVACY
Originating out of the implications of the use of technology, the reasonable expectation of privacy doctrine contemplates review of the implications of new technologies and advanced application of preexisting surveillance systems. By its subjective and objective tests, the doctrine permits review of personal privacy preferences in union with review of society’s interest in protecting privacy rights while advancing public safely interests.
Today, we face exponential increases in technological systems and instruments. More and more people use and depend upon electronic and wire communications for social contact, education, purchases, and security. In re Application of the United States, 809 F. Sup.2d 113, 114-15 (E.D.N.Y. 2011) (‘The vast majority of Americans own cell phones . . . Typically people carry these phones at all times: at work, in the car, during travel, and at home. For many Americans, there is no time in the day when they are more than a few feet away from their cell phones”). A simple stroll on a popular street exposes us to the ubiquitous presence of cell phones, I-phones, and surveillance cameras. Increasingly, Americans depend on these technologies to transact their everyday affairs. Correspondingly, computer systems store and share personal information on individuals contacts, communications, and habits.
Legislation on wire and electronic information systems reflects society’s interest in the benefits accruing from advances in capturing information, together with society’s concern that the accumulation of personal information poses risks to personal privacy. In re Application of the United States, 620 F.3d 304, 306 (3rd Cir. 2010) (‘The growth of communication has stimulated Congress to enact statutes that provide both access to information heretofore unavailable for law enforcement purposes and, at the same time, protect users of such communication services from intrusion that Congress deems unwarranted”). The Stored Communication Act reflects the need for maintaining a balanced approach to utilizing information stored in computer systems to assist victims of crime while imposing limitations on law enforcement’s access to such information. Determining the proper balance between privacy and safety interests lies at the heart of the reasonable expectation of privacy doctrine that serves as a limiting principle on the expansion of police powers. See Kyllo, 533 U.S. at 34 (finding the Fourth Amendment determines “what limits there are upon this power of technology to shrink the realm of guaranteed privacy”).
The creation and storage of cell phone information useful in identifying the location of a cell phone presents both benefits for public safety and genuine risks to privacy rights. In re Application of the United States, 809 F.Sup.2d at 115 (determining “cellular service providers have records of the geographic location of almost eveiy American at almost every time of day and night . . .”). To address privacy concerns, the SCA requires a warrant where the information request constitutes a search of the content of cell phone communications.
Cell phone location information can be tantamount to content. Id. at 126 (“[Access] to cumulative cell site location records would permit governmental intrusion into information which is objectively recognized as highly private”). ‘The whole of one’s movements over the course of a [prolonged period] is not constructively exposed to the public because like a rap sheet, that whole reveals far more than the individual movements it comprises.” United States v. Maynard, 615 F.3d 544, 561-62 (D.C.Cir. 2010). ‘The difference is not one of degree but of kind , for no single journey reveals the habits and patterns that mark the difference between a day in the life and a way of life, nor the departure from a routine that, like the dog that did not bark in the Sherlock Holmes story may reveal even more.” Id. at 562.
Allowing the government to have access to cumulative cell site information without a warrant permits prolonged surveillance of citizens movements, habits, and associations. In re Application of the United States, 809 F.Sup.2d at 119-20. Without the need for demonstrating probable cause the government “may obtain these records of our movements, study the map of our lives, and learn the many things we reveal about ourselves through our physical presence.” Id. at 115. Such access to personal information will constitute a manifold expansion of conventional police surveillance that is limited by the need to wisely deploy limited resources. Maynard, 615 F.3d at 565 (determining “practical considerations prevent visual surveillance from lasting very long”).
*73 Here however, the cell phone location information failed to call for either real-time tracking of the phone’s movements, or historical data on the cell phone’s location that would amount to prolonged surveillance providing the government with information from which it could discern an individual’s habits or proclivities. A discreet request for location information on cell phone’s use over a limited period, that is related to a particular criminal investigation, fails to implicate a cell phone user’s reasonable expectation of privacy. Rather, access to such information serves the public interest in the speedy investigation of criminal conduct without involving undue risk to privacy interests. ‘The Fourth Amendment is to be construed ... in a manner which will conserve public interests as well as the interests and rights of individual citizens.” Carroll v. United States, 267 U.S. 132, 149 (1925).
Another dimension of this case adds to the conclusion that the defendant lacked a reasonable expectation of privacy. Princiotta lacked the interests and rights here of a subscriber. Rather, Ms. Morgan possessed those rights, and she, regardless of defendant’s interests or desires, could consent to the relinquishment of such rights. The defendant thus lacked a reasonable expectation of privacy in the security of Ms. Morgan’s cell phone records.
FOURTH AMENDMENT ANALYSIS
Even if Princiotta possessed a reasonable expectation of privacy in the phone records location information, the procedure followed by the Grand Jury satisfied the reasonableness standard that constitutes the Fourth Amendment’s touchstone. The Grand Juiy “as an investigatoiy body [possesses] broad powers to inquire into all information that might possibly bear on its investigation ...” Commonwealth v. Williams, 439 Mass. 678, 683 (2003), quoting in part, In re a Grand Jury Investigation, 427 Mass. 221, 226 (1998), cert, denied sub nom A.R. v. Massachusetts, 525 U.S. 873 (1998).
Here, the Grand Jury investigating a homicide requested relevant and material records possessed by T-Mobile. See Commonwealth v. Doe, 408 Mass 764, 767-71 (1990) (“A summons to appear to testify before a grand jury or to produce documents generally is not as intrusive, nor do those circumstances have the. same likely stigma associated with them, as does an order to appear in a lineup. We, therefore, prescribe a showing of reasonable suspicion to support a grand jury’s lineup order . . .”). The requested records covered a period less than thirty hours. An affidavit signed by the Grand Jury’s legal advisor constituted a compelling account of the requested information’s relevancy and materiality. Upon reviewing the motion and accompanying affidavit a court signed the order to produce.
Based on the affidavit’s factual showing, the limited temporal scope of request, and the presence of judicial review, the order satisfied the Fourth Amendment’s “standard of reasonableness.” Doe, 408 Mass, at 769. Therefore, this court determines that even if the Fourth Amendment applied, the court order, issued in the circumstances of this case, satisfied the Fourth Amendment’s requirements.
ORDER
Based on the foregoing, this court DENIES defendant’s motion to suppress the cell phone record information obtained by the Grand Jury pursuant to the court order.

Testimonial evidence also described the “registration” process.

Consent to search differs materially from consent to seize. State v. Lacey, 204 P.3d 1192, 1206 (Mont. 2009) (‘The rationale for third party consent searches resting, as it does, upon the diminished expectation of privacy attending a third party’s common authority over the premises or effects to be searched, does not provide a sufficient basis for a third party’s consent to the seizure of another’s personal effects”); but see United States v. Clutter, 674 F.3d 980, 984-85 (8th Cir. 2012) (upholding temporary seizure to secure warrant).

Such cases have included those in which a customer forwarded checks to a bank. United States v. Miller, 425 U.S. 435 (1976).