Brassajrd, Raymond J., J.
On June 15, 2009, a jury found the defendant Michael Collins (“Collins”) guilty of second degree murder in violation of G.L.c. 265, §2, armed assault with intent to murder in violation of G.L.c. 265, § 18(b), and possession of a firearm without a license in violation of G.L.c. 269, § 10(h). The matter is currently before the court on Collins’s motion for a new trial pursuant to Mass.R.Crim.P. 30(b). After a review of the motion, this court concludes that a number of claims asserted by Collins can be decided on the papers because no substantial issue was raised warranting an evidentiary hearing. See Mass.R.Crim.P. 30(c)(3) (explaining that an eviden-tiary hearing is not required where “no substantial issue [was] raised by the motion or affidavits”). However, Collins’s claim of prosecutorial misconduct raises a substantial issue. Therefore, Collins’s motion for a new trial is DENIED, in part, on all claims except the allegation of prosecutorial misconduct.
BACKGROUND
The following is a brief summary of the evidence presented at trial, focusing on those facts relevant to the motion before this court. On December 5, 2006, Collins shot and killed Myles Lawton (“Lawton”) at Lawton’s girlfriend’s apartment at 91 Florida Street in Dorchester. Lawton’s friend Pierre LaGuerre (“LaG-uerre”) was present in the apartment, and was also shot, although he survived his injuries. The Commonwealth’s theory of the case was that the shooting was the result of a drug deal gone bad. Sometime before the shooting, LaGuerre entered into an agreement to purchase two kilos of cocaine for $40,000.00 from Collins. Collins was arrested in Washington D.C. on December 21, 2006.
Collins’s trial began on May 18, 2009 in the Suffolk Superior Court before this judge. After lunch break on the first day of trial, during jury empanelment, the court was alerted to the fact that one of the jurors spoke with an individual associated with Collins in the hallway outside of the courtroom. Tr. 1:101. In discussing the best way to handle the potential issue, the court was further alerted that three of Collins’s alleged family members were currently present in the courtroom. Id. at 103. The court was concerned with the fact that these family members were seated close to sidebar. Id. (“I mean, the record should reflect that they’re, of all the people in the courtroom, the closest to sidebar”). Jury empanelment consisted of individual voir dire with counsel, Collins, and the prospective juror at sidebar. When asked by defense counsel if the court wished to exclude the three family members from the courtroom, the court stated: “No, not at all. As I mentioned earlier, my concerns are always the opposite.”[1] Id. at 103-04.
The prosecutor then asked defense counsel to identify the three family members. Id. at 105. Defense counsel was unaware of who the family members were, but did not believe that they were potential witnesses. Id. She indicated that she asked family members who were potential witnesses to stay away from the courtroom during jury empanelment. Id. at 106 (“I told the [defendant’s] mother not to come today. She was on the witness list”).
After some time had passed, it was revealed that the three individuals were in fact Collins’s friends and family members, and were potential witnesses. Id. at 117-19. The Commonwealth became concerned because the individuals were speaking to each other while the court was inquiring of potential jurors. Id. at 117. The Commonwealth requested that all potential witnesses be barred from the courtroom. Id. at 119. Defense counsel did not object to their removal, and was in agreement with the Commonwealth that potential witnesses should not be in the courtroom during jury empanelment. Id. at 119-20, 123. The court then proceeded to voir dire the friends and family members to confirm that they were associated with Collins and were potential witnesses.[2] Id. at 121-24. The court requested that the potential witnesses leave the courtroom, with the approval of counsel. Id.
On the sixth day of trial, the Commonwealth called Dan Jensen (“Jensen”), a records custodian with Sprint-Nextel (“Sprint”). Tr. 6:176. Jensen testified as to subscriber information and call detail records (“CDR”) for a cell phone number, 781-420-9856, registered to Collins’s girlfriend Tiffany Lanides (“Lanides”). Id. at 188. There was evidence that Collins regularly used Lanides’s cell phone. The CDR was admitted into evidence without objection as Exhibit 103. Id. at 188-89. Jensen then proceeded to explain the information contained in the CDR.
Included in his testimony was an explanation of the numbers in the “repoll number” column of the CDR. Id. at 193. Jensen explained that the repoll number “will tell me which phone switch the [cell phone] call was routed through.” Id. He testified that a repoll number identifies a “mobile switching center” (“Switch”), which is “the physical connection between our [Sprint] cell sites and the other phone switches on the network . . .” Id. at 198-99. He explained that, *439 essentially, the Switches help to complete cell phone calls across the network. Id. at 207-10. Jensen stated that there were four Switches in the Boston area. Id. at 199. He further testified that each Switch covers a large area, possibly over 100 miles. Id. at 199-200.
On direct examination, Jensen was asked “if a repole [sic] number comes up from the Washington, D.C. area, what would that indicate to you about that phone call?” Id. at 200-01. He answered, “the headset for that call was more likely in the Virginia or the Maryland or Washington, D.C. area” and not in the Boston area. Id. at 201. The Commonwealth introduced into evidence a document containing a list of Sprint’s repoll numbers, and the location of the Switches that corresponded to the repoll numbers. Id. at 202. The CDR showed that after December 7, 2006, the Switches used by Lanides’s cell phone were located in the Washington D.C. area.
Also on the sixth day of trial, the Commonwealth called Teresa Jones (“Jones”) as a witness. Jones was Lawton’s girlfriend, and the shooting occurred in her apartment. Id. at 261-63. Jones was home the night of the shooting, watching a movie in her bedroom, with the door closed. Id. at 275. She testified that while she was watching the movie, someone poked his head into her bedroom and looked at her. Id. She stated that she did not get a good look at the person because she was lying down and “only saw him from the side.” Id. Shortly after the person left, the shooting started. Id. at 277.
On direct examination, Jones was asked about a photo array she was shown by Boston Police on January 5, 2007. Tr. 7:23. Jones testified that when she was originally shown the photo array, she narrowed in on two photographs, photographs Number 4 and Number 8, that resembled the person that she had seen in her bedroom on the night of the shooting. Id. at 26. She thought Number 4, which was a photograph of Collins, looked more like that person. Id. at 30, 35.
Jones was extensively questioned on cross examination about the photo array, and her failure to make a positive identification. Id. at 37-49, 111-12. On re-direct, Jones testified that the reason she could not make a positive identification from the photo array was because she only saw the person from the side. Id. at 125. She stated that she asked police at the time of the photo array if they had photographs of the individuals from a side view. Id. at 126. The prosecutor then asked Jones if she saw the person that had been in her bedroom the night of the shooting in the courtroom, and Jones identified Collins.[3] Id. at 127. Defense counsel did not object.
Lastly, the Commonwealth presented evidence implicating Collins in a shooting that took place in Chelsea six months prior to the murder. The Commonwealth called John Arnold (“Arnold”), the victim of the Chelsea shooting. There was evidence that Arnold had previously told police that Collins shot him. Tr. 9:158. However, at trial, Arnold denied identifying Collins as the shooter. Id. at 158-61. Arnold did not want to testify at trial, and was concerned with being considered a “snitch.” Id. at 157-58. The Commonwealth then introduced evidence that the gun used in the Chelsea shooting was the same gun used in the murder. During his closing argument, the prosecutor argued that the evidence showed that Collins committed both shootings. Tr. 12:147. He stated: “And you saw the charade that John Arnold tried to do in here last week. Is there any doubt in your mind that John Arnold knows who shot him? ... He lives in Chelsea. His family lives in Chelsea. John Arnold had a change of heart.” Id. at 147-48.
DISCUSSION
I. Standard
A court may grant a motion for a new trial when “it appears that justice may not have been done.” Mass.R.Crim.P. 30(b). The decision of whether to grant the motion is left to the sound discretion of the court. See Commonwealth v. Marrero, 459 Mass. 235, 240 (2011). The court should grant the motion, however, if the “trial was infected with prejudicial constitutional error.” See id. (internal quotations omitted).
II. Courtroom Closure
First, Collins argues that this court’s removal of three potential witnesses during juiy empanelment violated his constitutional right to a public trial. This court finds that the limited sequestration order issued in this case did not constitute a closure of the courtroom, and that this court did not abuse its discretion in issuing the order. Further, defense counsel was not ineffective for failing to object to the sequestration order.
Pursuantto the Mass.R.Crim.P. 21, “[u]pon his own motion or the motion of either party, the judge may, prior to or during the examination of a witness, order any witness or witnesses other than the defendant to be excluded from the courtroom.” The decision to sequester a witness is within the sound discretion of the trial judge, and the judge need not offer any special reason for the sequestration. See Commonwealth v. Blackburn, 354 Mass. 200, 205 (1968). Further, our courts have generally not considered a sequestration order to be a closure of the courtroom in the constitutional sense. See Commonwealth v. Buckman, 461 Mass. 24, 29 n.2 (2011); Commonwealth v. Jones, 71 Mass.App.Ct. 568, 571-72 (2008) (stating that a witness’s exclusion was not “a closure of the court room, but rather . . . the proper exercise of a judge’s discretion to order the sequestration of witnesses under Mass.R.Ciim.P. 21”); see also Commonwealth v. Sevieri, 21 Mass.App.Ct. 745, 757 (1986) (“we see a distinction between the general public and witnesses when encouraging attendance throughout trials”).
Here, the court did not exclude all of Collins’s friends and family, but only potential witnesses at the *440 specific request of the Commonwealth. See Jones, 71 Mass.App.Ct. at 572. This limited exclusion did not constitute a closure or even partial closure of the courtroom. See Commonwealth v. Cohen (No. I), 455 Mass. 600, 607 n.10 (2010) (explaining in dicta that one of the defendant’s excluded friends was a potential witness “and would not have been allowed in the court room for empanelment in any event because of a witness sequestration order in the case”); United States v. Izac, 239 F.App’x 1, 4 (4th Cir. 2007) (finding that because the district court excluded a witness from the courtroom during jury empanelment “only to ensure the seating of an impartial jury, [and] that she was subject to exclusion in any event . . . , and that the courtroom otherwise remained open to the public, [the defendant’s] Sixth Amendment right to a public trial was not implicated”). Nor was it an abuse of discretion. See Jones, 71 Mass.App.Ct. at 572. The court, the Commonwealth, and even defense counsel were concerned with witnesses being present close to sidebar, and speaking with and in front of potential jurors. There was no error in the limited sequestration of the witnesses during juiy empanelment. Accordingly, because there was no closure of the courtroom, and the court was within its discretion in sequestering the witnesses, defense counsel was not ineffective for failing to object. See Commonwealth v. Saferian, 366 Mass. 89, 96 (1974).
III. Cell Phone Records and Related Testimony
Collins raises a number of arguments with respect to the admission of the CDR for Lanides’s cell phone, and Jensen’s testimony concerning repoll numbers and Switches. Specifically, he argues: (1) the CDR should have been suppressed because it was obtained without a search warrant and in violation of 18 U.S.C. §2703; (2) he did not receive notice that Jensen would testify as an expert about cell phone tracking and the court erred in denying his motion for a continuance; (3) evidence regarding cell phone tracking is unreliable, and thus, it was error for it to be admitted as evidence; and (4) Jensen was not qualified to give an expert opinion about cell phone tracking. Each argument is discussed below.
A. Background on Cell Phone Technology
Cell phone networks are divided geographically into coverage areas that contain towers through which the cell phones transmit and receive calls. In re Application of the United States of Am. for an Order Directing a Provider of Elec. Commc’n Serv. to Disclose Records to the Gov’t, 534 F.Sup.2d 585, 590 (W.D.Pa. 2008): “When a call is received, a [Switch] gets the call and locates the user based on the nearest tower; the call is then sent to the phone via that tower.” Id.; see Commonwealth v. Princiotta, 31 Mass. L. Rptr. 68, 69-70 (Mass.Super. 2013) (Kane, J.) (explaining “[w]hen a cell phone user makes a call, the cell phone provider’s [Switch] . . . locates the cell phone that the call has been placed to, along with the nearest cellular tower to that cell phone . . . [and] [t]hat cellular tower transmits to that cell phone the communications from the caller”). Unlike Cell Site Location Information (“CSLI”),[4] which is transmitted whether or not the cell phone is actively being used, a cell phone only connects to a Switch when the phone is sending or receiving a call. See In re Application for Pen Register & Trap/Trace Device with Cell Site Location Authority, 396 F.Sup.2d 747, 750-51 (S.D.Tex. 2005), citingU.S. Dep’t of Justice, Electronic Surveillance Manual, at 178-79 n.41 (rev. June 2005) (noting Switches “handle! ] all phone connections and control! ] all base stations in a given region”).
The CDR for Lanides’s cell phone contained information regarding Switches. Importantly, it did not contain CSLI. The Commonwealth did not obtain CSLI in the current case, and no evidence regarding CSLI was offered at trial.
B. Suppression Issues
i. Compliance with 18 U.S.C. §2703(d)
The Stored Communications Act (“SCA”) allows the Commonwealth to obtain “records concerning electronic communication” from a cell phone provider by obtaining a court order. See 18 U.S.C. §2703(c)(l)(B). To get such an order, the Commonwealth must show “specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation.” Id. §2703(d).
Here, the Commonwealth has provided an Order issued by a Justice of the Superior Court dated January 19, 2007. The Order required Sprint to provide the Commonwealth with records concerning electronic communications for cell phone number 781-420-9856, Lanides’s cell phone, from October 1, 2006 through January 31, 2007 pursuant to 18 U.S.C. §2703. Therefore, the Commonwealth complied with the SCA in obtaining the CDR.
ii. Search Warrant
Because Collins did not move to suppress the CDR, the claim that this evidence should have been suppressed because it was obtained without a search warrant will be analyzed under the ineffective assistance of counsel framework. See Commonwealth v. Comita, 441 Mass. 86, 90-93 (2004); Saferian, 366 Mass, at 96-97 (finding that to prevail on a claim of ineffective assistance of counsel, the defendant bears the burden of proving that the behavior of counsel fell “measurably below that which might be expected from an ordinary fallible lawyer” and that such failing “likely deprived the defendant of an otherwise available, substantial ground of defense”). “[I]n order to prevail on an ineffective assistance of counsel claim on the ground of failing to file a motion to suppress, the defendant has to demonstrate a likelihood that the motion to suppress would have been successful.” Comita, 441 Mass, at 91 (“the defendant . . . must *441 prove that, had such a motion been timely filed, the Commonwealth would not have been able to prove that [the government’s actions were] constitutional”).
Here, it is undisputed that the Commonwealth did not obtain a search warrant for the CDR, and the Commonwealth does not contend that the information submitted in support of its application under the SCA contained sufficient facts to amount to probable cause. However, Collins has failed to show that the Fourth Amendment of the United States Constitution or Article 14 of the Massachusetts Declaration of Rights mandates that the CDR should have been suppressed.
To date, neither the Supreme Judicial Court, the Appeals Court, nor the United States Supreme Court has directly addressed the issue of whether the government must obtain a search warrant or have probable cause to access an individual’s CSLI. There is a split among federal courts as to whether a warrant is required, however, the majority, including the United States District Court for the District of Massachusetts, have found that as long as the government complies with the SCA, no further action is necessary to satisfy the Fourth Amendment. See In re Application of the United States of Am. for an Order Pursuant to Title 18, United States Code, Section 2703(d) to Disclose Subscriber Information and Cell Site Information, 849 F.Sup.2d 177, 177, 179 (D.Mass. 2012) (showing of probable cause not required to obtain CSLI); see also In re Application of the United States of Am. for an Order Directing a Provider of Electronic Comm’ns to Disclose Records to the Gov’t, 620 F.3d 304, 313 (3rd Cir. 2010) (holding that “CSLI from cell phone calls is obtainable under a §2703(d) order and that such an order does not require the traditional probable cause determination”). But see, e.g., In re Application of the United States of Am. for an Order Authorizing the Release of Historical Cell-Site Information, 809 F.Sup.2d 113, 119-20 (E.D.N.Y. 2011) (“cellphone users maintain a reasonable expectation of privacy in long-term [CSLI] and ... the Government’s obtaining these records constitutes a Fourth Amendment search”). The Justices of the Superior Court are also split as to whether obtaining CSLI without probable cause violates the Fourth Amendment or Article 14. Contrast Commonwealth v. Pitt, 29 Mass. L. Rptr. 445, 451 (Mass.Super. 2012) (Cosgrove, J.) (suppressing CSLI obtained -without a warrant), Commonwealth v. Wyatt, 30 Mass. L. Rptr. 270, 274 (Mass.Super. 2012) (Lowy, J.) (same), and Commonwealth v. Augustine, SUCR2011-10748, slip op. at 9, 13 (Mass.Super. April 2, 2013) (Sanders, J.) (same), with Princiotta, 31 Mass. L. Rptr. at 73 (denying motion to suppress, explaining “[a] discreet request for location information on cell phone’s use over a limited period, that is related to a particular criminal investigation, fails to implicate a cell phone user’s reasonable expectation of privacy”).
Whether the Fourth Amendment has been implicated “depends on whether the person invoking its protection can claim a ‘justifiable,’ a ‘reasonable,’ or a ‘legitimate expectation of privacy’ that has been invaded by government action.” Smith v. Maryland, 442 ■U.S. 735,740 (1979); see also Commonwealthv. Blood, 400 Mass. 61, 68 (1987) (utilizing similar test for Article 14 analysis). This inquiry raises two discrete questions. First, “whether the individual, by his conduct, has exhibited an actual (subjective) expectation of privacy.” Smith, 442 U.S. at 740 (internal quotations omitted). Second, “whether the individual’s subjective expectation of privacy is one that society is prepared to recognize as ‘reasonable,’—whether . . . the individual’s expectation, viewed objectively, is ‘justifiable’ under the circumstances.” Id.
This court acknowledges that it is a close question as to whether a cell phone user has a reasonable expectation of privacy in his or her CSLI. However, this court believes that the Switch location information contained in the CDR is distinguishable from CSLI and GPS tracking. See United States v. Jones, 132 S.Ct. 945, 949 (2012) (holding that “the Government’s installation of a GPS device on a target’s vehicle, and its use of that device to monitor the vehicle’s movements, constitutes a ‘search’ ”); Commonwealth v. Connolly, 454 Mass. 808, 819-24 (2009) (finding installation of GPS tracking device violated Article 14). Unlike CSLI or GPS tracking, which Switch a cell phone connects through offers little insight into an individuars location. See Jones, 132 S.Ct. at 955 (Sotomayor, J., concurring) (“GPS monitoring generates a precise, comprehensive record of a person’s public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations”). As Jensen testified, a Switch covers a wide area, as large as 100 miles. Further, an individual is likely aware that a cell phone provider uses its equipment to connect phone calls.[5] See Smith, 442 U.S. at 745-46 (finding the warrantless use of pen registers, a mechanical device that records the numbers dialed on a telephone, did not violate the Fourth Amendment because an individual has no objective or subjective expectation of privacy in the telephone numbers he or she dials). Unlike CSLI, Switch information is only obtained when a cell phone makes or receives a call. Given these facts, especially the differences between Switch information and GPS tracking, and the unsettled state of the law, Collins has failed to show that he had an objective or subjective expectation of privacy in the CDR, such that the “Commonwealth would not have been able to prove that [the government’s actions were] constitutional.” See Comita, 441 Mass. at 91.
C. Lack of Notice
In accordance with the Superior Court Order issued pursuant to the SCA, Sprint provided the CDR for cell phone number 781-420-9856, Lanides’s cell phone. Included in the CDR was a section entitled “Key to *442 Understanding Viador Reports,” which defined “repoll number” as “which switch is being used.” The CDR had a column labeled “REPOLL #.” Sprint also provided a list that identified which Switches corresponded to the various repoll numbers. The CDR and the list of Switches were provided to the defense in May 2008 pursuant to Mass.R.Crim.P. 14, about a year before trial.
Here, defense counsel had proper notice of the CDR and its contents, and was on notice that the Commonwealth might introduce evidence regarding the repoll numbers. The CDR contained the repoll numbers, and defense counsel was provided with a list demonstrating that each repoll number corresponded to a Switch in a certain location. It follows logically that a records custodian might testify as to the various columns contained in the CDR, including an explanation of the repoll numbers and the Switches they corresponded to.[6]
D. Reliability of Cell Phone Tracking Evidence
Collins’s argument regarding the reliability of the evidence in question also fails. In support of his motion for a new trial, Collins submitted the affidavit of Paul Daubitz (“Daubitz”), a professional in the telecommunications and information technology industries. In the affidavit Daubitz states that “[Regarding the inference that the Defendants [sic] cell phone was in the Washington, DC area, given the vagaries of Repols or MSC’s [Switches] in terms of the large area they can serve, the testimony that the defendants [sic] cell phone was likely in the Washington DC area, in my opinion, should not have been allowed.”
Daubitz, however, misstates the evidence that was offered at trial. Jensen testified that it was likely that Lanides’s cell phone was somewhere in the Maryland, Virginia, or Washington D.C. area, and not the Boston area. He was clear that Switches cover a large area, and that Switches could only offer a very general idea as to where the cell phone in question was located. Notably, Jensen did not seek to offer the exact location of the cell phone, or even state that a cell phone uses the nearest available Switch. Cf. United States v. Evans, 892 F.Sup.2d 949, 956-57 (N.D.I11. 2012) (finding cell phone tracking evidence to be unreliable, in part, because the expert assumed that a cell phone always uses the cell phone tower closest to it). There is nothing to suggest that such testimony was unreliable.
E. Expert Qualifications
Collins argues that Jensen, as a records custodian for Sprint, was not qualified to give an expert opinion on Switches and how to determine a cell phone’s location based on Switch information. This court finds, however, that Jensen was qualified to offer the testimony that he gave at trial.
A number of federal courts have determined that a records custodian for a cell phone provider may give lay testimony concerning how cell phone towers operate, and the likely location of a cell phone based on which tower the phone used. See United States v. Kale, 445 F.App’x 482, 485-86 (3rd Cir. 2011) (holding that records custodian’s testimony concerning cell phone records and locations of cell phone towers was based on sufficient personal knowledge and was not “scientific, technical, or specialized” in nature); United States v. Feliciano, 300 F.App’x 795, 800-01 (11th Cir. 2008) (holding that police officer’s testimony about cell tower sites was admissible as lay witness testimony, noting that the officer “simply reviewed the cellular telephone records and a summary of those calls, which identified cellular towers for each call, and based on his personal knowledge concerning the locations of certain cellular towers, testified that, at the time of the call, [the individual’s] cellular telephone was nowhere near the arrest location”). Here, as a records custodian, Jensen was able to testify concerning the information contained in the CDR, including which Switch Collins’s cell phone connected through.
Assuming Jensen’s testimony constituted an expert opinion, Jensen had sufficient training and experience to testify about how Switches operate. See United States v. Baker, 496 FApp’x 201, 204 n.l (3rd Cir. 2012) (stating records custodian for Sprint “had sufficient training and experience to testify about the operation of cell phone towers”). Jensen worked at Sprint for approximately six and a half years. He started as an electronic surveillance technician, working with law enforcement on real-time surveillance. See id. (noting that the records custodian in question also worked in the electronic surveillance group). He used CDRs, including Switch information, to find the locations of mobile devices. Tr. 6:197-198. Therefore, Jensen had sufficient training, experience, and knowledge of how cell phone Switches operate to testify reliably on that subject. See id.; see also Common-wealthv. Richardson, 423 Mass. 180, 183 (1996) (‘The crucial issue, in determining whether a witness is qualified to give an expert opinion, is whether the witness has sufficient ‘education, training, experience and familiarity’ with the subject matter of the testimony”) .
Importantly, Jensen testified that Switches cover a wide area, sometimes as large as 100 miles, and that a cell phone that used a Switch located in Washington D.C., “was more likely in the Virginia or the Maryland or Washington, D.C. area,” and not in the Boston area. Tr. 6-201; see United States v. Fama, 2012 U.S.Dist. LEXIS 174887 at *6-*8 (E.D.N.Y. Dec. 10, 2012) (“Notably, the Government states it does not intend to introduce evidence predicting the exact location where [the individuals] were at any particular point in time on December 29, 2011”). Jensen’s training and experience qualified him to give this very generalized estimation of where Lanides’s cell phone was located when the calls in question were made.
*443 F. Error Nonpréjudicial
Even assuming an error regarding the cell phone testimony occurred, such an error was nonprejudicial. “An error is nonprejudicial . . . ‘[i]f . . . the error did not influence the jury, or had but very slight effect.’ ” Commonwealth v. Reyes, 464 Mass. 245, 259-60 (2013), quoting Commonwealth v. Flebotte, 417 Mass. 348, 353 (1994).
Collins argues that the Commonwealth offered the cell phone evidence in an attempt to establish that he fled the Boston area after the murder, indicating a consciousness of guilt. However, ample evidence was presented at trial that Collins left Boston shortly after the murder and went to Washington D.C. The murder occurred on December 5, 2006. The jury heard testimony that the day after the murder, December 6, 2006, Collins and Lanides went to the rental car agency, and switched the white SUV that Collins had driven the night before with a red SUV. Tr. 7:169; 8:42-53. Further, after the vehicle was switched, Lanides left Boston to stay at her mother’s home. Tr. 10:188, 195. When she returned to Boston on December 11, 2006, Collins was no longer there. Id. at 207. Collins was arrested in Washington D.C. on December 21, 2006, sixteen days after the murder. Tr. 7:275-77. When he was arrested, the police found business cards in his pocket with a Washington D.C. phone number printed on them. Id. at 285. In fact, in her closing argument, defense counsel did not contest that Collins was in Washington D.C. shortly after the murder, but instead, argued that he had ties to the area that reasonably explained his presence there. Tr. 12:109-10.
Thus, there was ample evidence from which the jury could have concluded that Collins left Boston shortly after the murder and went to the Washington D.C. area. The cell phone evidence, which showed that Lanides’s cell phone used Switches in the Washington D.C. area after December 7, 2006, was merely cumulative of the uncontested fact that Collins left Boston after the murder. The introduction of the cell phone evidence “did not influence the juiy, or had but very slight effect.” See Reyes, 464 Mass, at 259-60.
IV. In-Court Identification
Collins argues that defense counsel was ineffective for failing to object and move for a mistrial when Jones identified Collins in court. He argues that the identification was unreliable and inherently suggestive.
There is a “degree of suggestiveness” inherent in the identification of a suspect in a courtroom. Commonwealth v. Choewm, 446 Mass. 510, 519 (2006). However, the fact that an identification is made in court “does not, in itself, render the identification impermis-sibly suggestive.” Id. at 519-20, quoting Commonwealth v. Napolitano, 378 Mass. 599, 604 (1979). “Rather, an in-court identification is excluded if it is tainted by an out-of-court confrontation arranged by the Commonwealth that is ‘so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.’ ” Id. at 520, quoting Simmons v. United States, 390 U.S. 377, 384 (1968); see Commonwealth v. Lacy, 371 Mass. 363, 368-69 (1976) (declining to “adopt a per se exclusionary rule condemning as constitutionally infirm all subsequent identifications of a defendant by any witness who had previously failed to select the defendant from a lineup . . . While the lack of prior identification is one factor which may properly be considered by the jury in evaluating the witness’s credibility, it need not be wholly dispositive”).
Here, there is nothing to indicate that the photo array shown to Jones was impermissibly suggestive. See Choeum, 446 Mass, at 520; Kent B. Smith, Criminal Practice and Procedure §7.54, at 681 (3d ed. & Supp. 2013) (“If a witness has failed to make an out-of-court identification, any subsequent identification, including the in-court identification is not necessarily barred but the lack of prior identification is one factor which may properly be considered by the jury in evaluating the witness’s credibility”). Jones testified that she thought that two of the photographs resembled the person she had seen in her bedroom on the night of the shooting. Of the two, she testified that the photograph of Collins most resembled the person in question. Further, she explained that she failed to make a positive identification from the original photo array because she had seen the person in question from the side, and all of the photographs depicted the individuals facing forward. See Lacy, 371 Mass, at 368-69 (finding that there was no error in allowing an in-court identification where the witness failed to make a positive identification during a lineup conducted shortly after the crime, noting that there was “evidence as to why the witness had not identified the defendant at the lineup”). Because there was no error in admitting the in-court identification, defense counsel was not ineffective for failing to object. See Safer-ian, 366 Mass, at 96-97.
Assuming arguendo that Jones’s in-court identification was improper and should have been excluded, there was no prejudice to Collins. Defense counsel extensively cross-examined Jones concerning the photo array and subsequent in-court identification. See Commonwealth v. McLeod, 394 Mass. 727, 742-43 (1985) (“The lack of a prior identification . . . was ‘one factor which may properly be considered by the jury in evaluating the witness’s credibility’ . . . [the defendant] ‘was given every opportunity to explore [the inconsistencies] in cross examination’ ”). Defense counsel presented the jury with ample reasons as to why Jones’s testimony was suspect and should not be credited. Notably, even if the in-court identification had been excluded, Jones had picked Collins’s photograph as the one who most *444 resembled the person she saw in her bedroom on the night of the shooting.
Further, other witnesses provided testimony that linked Collins to the shooting. Desmond Sheets testified that he saw a person matching Collins’s description run out of Jones’s apartment -with a gun in his hand shortly after the shooting.[7] Tr. 5:160-63. He picked Collins’s photograph out of a photo array, testifying that the person in the photograph was “similar comparison to the person I saw that night.” Id. at 186. Melissa Sheets also testified that she saw an individual matching Collins’s description run out of the apartment shortly after the shooting. Id. at 100-03. In addition, LaGuerre identified Collins as the shooter. Tr. 3:96; 7:146. From all this testimony, the juiy could have reasonably concluded that Collins was the shooter without Jones’s in-court identification.
V. Commonwealth’s Closing Argument
Lastly, Collins argues that defense counsel was ineffective for failing to object to the prosecutor’s closing argument, specifically with respect to Arnold’s credibility. Collins argues that the prosecutor improperly insinuated that Arnold should not be believed because he was from Chelsea.
Collins, however, mischaracterizes the prosecutor’s argument. Arnold did not want to testify at trial, and stated that he did not want to be considered a “snitch. ” He testified that he and his family lived in Chelsea, which was where he was shot. Thus, it likely that the prosecutor was trying to argue that Arnold was reluctant to identify the person who shot him because he still lived in the same community where the shooting had taken place. The prosecutor made no explicit statement indicating that individuals from Chelsea should not be believed.
“In closing argument, counsel ‘may argue from the evidence and may argue fair inferences that might be drawn from the evidence.’ ” Commonwealth v. Ridge, 455 Mass. 307, 330 (2009), quoting Commonwealth v. Murchison, 418 Mass. 58, 59-60 (1994). Further, counsel “may state logical reasons why a witness’s testimony should [not] be believed ...” Commonwealth v. Caillot, 454 Mass. 245, 259 (2009) (differing from improper vouching, which constitutes expressing “a personal belief in the credibility of a witness”). ‘The credibility of witnesses is obviously a proper subject of comment.” Commonwealth v. Kee, 449 Mass. 550, 560 (2007).
Here, there was no error in defense counsel failing to object to the prosecutor’s closing. There was evidence introduced at trial that Arnold’s testimony was at odds with his prior statements. See Ridge, 455 Mass, at 330. There was also evidence that he and his family were living in the community where Arnold was shot. The prosecutor could properly comment on Arnold’s credibility, and offer a logical reason as to why he should not be believed. See Caillot, 454 Mass, at 259.
ORDER
For the foregoing reasons, Collins’s motion for a new trial is DENIED with respect to claims concerning: (1) courtroom closure; (2) evidence regarding cell phones and cell phone tracking; (3) in-court identification; and (4) the prosecutor’s reference to a witness being from Chelsea in his closing argument. It is further ORDERED that an evidentiary hearing be conducted with respect to the single remaining claim regarding prosecutorial misconduct.

The court was aware of and concerned with courtroom closure related issues. At one point, ■ defense counsel suggested clearing the courtroom except for family members of the defendant and victims, and bringing the jurors in one at a time. Tr. 1:77. This court refused the request, noting, “I’m not going to do that. That raises Constitutional issues.” Id.

The male individual in the courtroom stated that he was a close friend of Collins’s family. The two women were Collins’s sisters. The court voir dired only two of the individuals. The third had already left the courtroom at the direction of defense counsel because she was a potential witness. Tr. 1:123-24.

On re-cross, defense counsel questioned Jones as to why she was able to identify Collins in court when she had been unable to identify him from the photo array. Tr. 7:130-31. Jones answered that she could identify Collins in court because she was able to see him from the side. Id. at 131.

To put it simply “a cell phone is (among other things) a radio transmitter that automatically announces its presence to a cell tower via a radio signal over a control channel... By a process of triangulation from various cell towers, law enforcement is able to track the movements of the target phone . . .” In re Application for Pen Register, 396 F.Sup.2d at 751. Records from cell phone providers that contain this cell tower information are referred to as CSLI.

‘The switching equipment [Switches for landlines as opposed to cell phones] that processed those [phone] numbers is merely the modern counterpart of the operator who, in an earlier day, personally completed calls for the subscriber. Petitioner concedes that if he had placed his calls through an operator, he could claim no legitimate expectation of privacy. We are not inclined to hold that a different constitutional result is required because the telephone company has decided to automate.” Smith, 442 U.S. at 744-45 (internal citations omitted).

Nor was defense counsel ineffective for failing to obtain an expert to challenge the Commonwealth’s evidence. Defense counsel was a highly experienced criminal defense attorney. As will be discussed, this failure to obtain an expert did not constitute behavior falling “measurably below that which might be expected from an ordinary fallible lawyer” or that “likely deprived the defendant of an otherwise available, substantial ground of defense.” Sqferian, 366 Mass, at 96-97.

He testified that the person was wearing a New York Mets jacket. Tr. 5:163. Collins was arrested with aNew York Mets jacket in his possession. Tr. 7:282; 8:141.